UNITED STATES of America,
Plaintiff-Appellee,

v.

Ronald CAVALE, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Terrence FAUL, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas KURZ, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony C. KOVIC, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Daniel PACELLA, Defendant-Appellant.

Nos. 81–1836 to 81–1838, 81–1840
and 81–2016.

United States Court of Appeals,
Seventh Circuit.

Argued June 9, 1982.

Decided Sept. 7, 1982.

Rehearings Denied Oct. 25, 1982.

Certiorari Denied Nov. 15, 1982.
See 103 S.Ct. 380.

Richard F. Walsh, David P. Schippers, Schippers, Long & Mackay, Jeffrey Neal Cole, Ltd., Sherman M. Carmell, Carmell, Charone & Widmer, Ltd., Chicago, Ill., for defendants-appellants.

James R. Ferguson, Asst. U. S. Atty., Robert W. Tarun, Dan K. Webb, U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before WOOD and COFFEY, Circuit Judges, and CAMPBELL,* Senior District Judge.

COFFEY, Circuit Judge.

This case is a consolidation of five appeals from the defendants' jury convictions, of mail fraud and extortion.

The appellants herein whose cases were joined for trial, were charged with violating 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1951 (extortion and attempting extortion), for their involvement in a scheme to defraud the City of Chicago and its Police Department by submitting fraudulent billings for the repair of squad cars and other vehicles of the Chicago Police Department. The appellants include one officer of the Chicago Police Department, three civilian supervisory personnel of the Police Department, and one private garage vendor under contract to the City of Chicago Police Department. Essentially, the defendants allege three grounds for reversal exist: The trial court abused its discretionary power in denying the defendants' motion for severance on the grounds of prejudicial joinder; the evidence at trial was insufficient to support the convictions of appellants Kovic and Cavale; certain remarks by the trial court judge deprived Cavale of a fair trial.

## BACKGROUND

The Chicago Police Department organizational chart lists six bureaus, with each bureau further divided into divisions. One of these divisions, the Electric Motor Maintenance Division, is responsible for the repair of Chicago Police Department vehicles, and during the course of the events herein operated four police garages located in different areas of the city. The City of Chicago awarded yearly contracts to private automobile repair vendors under established procedures. These vendors were responsible for repairing vehicles which could not be repaired by the department's own Motor Maintenance Division because the mechanical repairs were too extensive and expensive or because the repairs involved body work which the division was not equipped to handle. Vendors interested in bidding for the contract work submitted sealed bids that were forwarded to the Chief of the Motor Maintenance Division, the highest ranking civilian in the Chicago Police Department. The Chief was authorized to approve or disqualify vendors if he determined that their repair facilities were inadequate. Once the head of the department determined that certain garages were qualified vendors, he would then recommend to the Purchasing Department that these vendors with adequate facilities be awarded contracts, and the Purchasing Department would, in turn, award contracts to the lowest qualified bidders.

Once the department and a repair vendor had agreed on a contract price to perform services for the department, the vendor was assigned work from the police garage located in his (vendor's) particular area of the city. When a police department vehicle was found in need of mechanical repair, other than bodywork, it was taken to the nearest of the four police garages located throughout the city and examined by a police department mechanic. If the mechanic discovered that the necessary repairs were too extensive and costly, the mechanic obtained the approval of a garage supervisor to have the car repaired by the designated vendor in that area. The damaged vehicle was then transported to the vendor, along with two copies of the Vehicle Work Order (VWO) describing the necessary repairs and containing the mechanic's signature as well as his supervisor's authorization for the work described thereon.

If a police department vehicle was involved in an accident, a somewhat different procedure was involved. Initially, an evi-

---

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

dence technician was dispatched to the scene of the accident to photograph the damage to the squad car and the vehicle was then inspected by an accident investigator who determined the extent of the necessary repairs. Since the Motor Maintenance Division was not equipped to do any bodywork, the investigator would then record the needed repairs on a vehicle work order, and the car would be towed to the private vendor. Each month, the private vendors doing repair work would submit their invoices with supporting VWO's to the police billing department. These documents would then be forwarded to the Chief of the Motor Maintenance Division for his inspection and approval. If the Chief approved the billing, he would then sign the invoice and transmit same with the VWO's to the finance division for payment via the U. S. mail service. If the Chief did not approve of the payment, the city would not issue a check.

### FACTS

In February of 1976, Miles Coleman, a police department mechanic assigned to Garage No. 1 and a defendant herein, arranged for Richard Nawrocki, and Nawrocki's partner, the defendant-appellant Ron Cavale, to meet with defendant-appellant Anthony Kovic, the Chief of the Motor Maintenance Division, at the headquarters of the Motor Maintenance Division. Richard Nawrocki was a garage vendor who was originally charged with the other defendants in the indictment but who, pursuant to a plea bargain, pleaded guilty and became the government's chief witness at trial. Nawrocki and Cavale were interested in becoming garage repair vendors to recondition damaged city police vehicles and met with Chief Kovic to explain that they were interested in entering into a contract with the Chicago Police Department to do repair work on police vehicles. After this initial meeting, Nawrocki and Cavale formed "Mar-Lin Automotive," rented a garage and filed a bid for a police repair contract.

During the trial Nawrocki testified that several days after this bid was filed with the city, and after the bidding deadline had passed, Coleman, the mechanic at Garage No. 1, telephoned him (Nawrocki) and told him that he should reduce his "Mar-Lin Automotive" hourly bid rate from $11.00 per hour to $10.00 per hour. Nawrocki further testified that Coleman provided him with a model letter from Allied Automotive,[1] addressed to defendant Kovic for Nawrocki to use when sending the letter of transmittal reducing Mar-Lin's bid from $11.00 to $10.00 per hour. Several weeks later, Mar-Lin was awarded a city contract to repair Chicago Police vehicles.

On July 1, 1976, the first day of the contract, Nawrocki and Cavale opened the Mar-Lin Automotive repair business at 455 West 61st Street, Chicago, Illinois. After Mar-Lin failed to receive any business from the police garages during their first few weeks of operation, Nawrocki and Cavale contacted Coleman in mid-July and complained about the lack of work. Shortly thereafter, Coleman visited Nawrocki at the Mar-Lin garage and presented him with a number of blank VWO's, declaring "here is some work orders. [sic] Write them up and we'll split them 50/50." Coleman instructed Nawrocki to fill out the work orders, contemplating a 50/50 split on the proceeds from the fraudulent billings, and Coleman stated that half of his 50 percent was going to be turned over to the defendant Kovic. Nawrocki testified that he noticed the work orders he received from Coleman contained the vehicle numbers of squad cars that had never been repaired by Mar-Lin Automotive.

After this initial meeting between Coleman and Nawrocki, Nawrocki testified that he discussed Coleman's proposal with Cavale, his co-owner. Cavale agreed with Nawrocki that the two owners had no choice but to accept Coleman's billing procedure and terms as there were no other

---

1. Allied Automotive's activities with regard to Chicago Police Department personnel were the   subject of another indictment.

business prospects at that time. Cavale was reported to have stated "as long as we don't have to do the work, I guess it's all right."

Several days later, Nawrocki filled out the blank VWO's with false billing numbers and submitted the orders and corresponding invoices to the police billing office. Nawrocki then gave Coleman $500 to cover Coleman's half of the expected $1,000 check. At the time Nawrocki made this payment, Nawrocki asked Coleman if Mar-Lin could wait until after Mar-Lin had received the city check for the phony VWO's before making its next payment. Coleman refused to allow this, explaining "We want to make sure you are good payers."

Thereafter, until late 1979, Coleman continued to make monthly visits to the Mar-Lin garage, bringing with him between 5 and 15 fraudulent vehicle work orders on each visit for cars which had never been brought to Mar-Lin for repairs (no-goes). Coleman also authorized additional unnecessary repairs on cars that had actually been taken to the garage (add-ons), even though these repairs were never performed but were nonetheless charged to and paid for by the city. Ultimately, Coleman was receiving an average of $2,000 a month, a total in excess of $100,000 from the summer of 1976 through fall of 1979.

In September of 1976, defendant-appellant Pesha, a police officer working as an accident investigator, approached Nawrocki at his Mar-Lin office and told Nawrocki that he had learned from Coleman that Mar-Lin Automotive was interested in "doing some work." Nawrocki further testified as to his dealings with Pesha that Pesha stated "we work it the same way with the body work as [Coleman] does with you," adding that half of the percentage had to go to the defendant Kovic. After Pesha left the garage, Nawrocki spoke with Cavale and told him that Pesha also wanted to join in the fraudulent scheme of submitting inflated accident repair bills and also split the proceeds on a 50/50 basis. Cavale agreed to Pesha's proposition and, since Mar-Lin was without any accident repair forms, Cavale ordered and obtained more than 1,000 forms for accident repair from a local printer for use in preparing the fraudulent accident repair billings. Nawrocki, describing Pesha's actions in further detail, testified that Pesha arrived at Mar-Lin Automotive the very next day to demonstrate to Nawrocki how to fill out the fraudulent accident reports. Pesha described how to inflate billing figures through recording "accumulated damage"[2] repairs on the estimate forms. Pesha was described as also having given Nawrocki a number of inflated billing figures recorded as "accumulated damage" repairs on the estimate form. Nawrocki followed through with the proposed scheme, later billing the city for the fraudulent claim as demonstrated by Pesha and split the proceeds with him (Pesha).[3]

Thereafter, from 1976 until the end of 1979 when the federal government undertook to begin its investigation, Nawrocki and Pesha submitted phony "accident and accumulated damage" reports and bills to the city. Nawrocki wrote up the phony estimate sheets for repair damage, while Pesha supplied the corresponding false vehicle work orders. At one point in the trial, it was recited that Pesha confided to Nawrocki that he was routinely increasing his fraudulently obtained take home pay by supplying his own accident cases by taking a tour of the parking lot and side-swiping a few squad cars parked on the lot every morning when he reported for duty. As a result of this intentional damage to the city vehicles and other fraudulent activities, Pesha was able to increase his income anywhere from $3,000 to $8,000 a month from 1976 through 1979.

**2.** Accumulated damage on a police department vehicle refers to body damage that accumulated over a period of time and was not traceable to a specific collision or accident; in other words, accumulated damage is "wear and tear" type of body damage (scratches, dents, etc.).

**3.** The normal ratio of "accident damage" billings to "accumulated damage" billings is 4 to 1. In the cases of defendants Kurz and Pesha, however, the ratio was 1 to 2.

In June of 1977, Nawrocki bought out Cavale's partnership interest in Mar-Lin Automotive but Cavale continued to work for Nawrocki only as a mechanic (employee) for the firm.

In the fall of 1977, defendant-appellant Terry Faul, a machinist foreman assigned to Garage No. 3 of the Motor Maintenance Division also joined in with the fraudulent scheme to inflate income, and approached Nawrocki at his (Nawrocki's) Mar-Lin garage and told Nawrocki that he wanted Mar-Lin to do some repair work on his (Faul's) personal recreational van. Nawrocki agreed and Faul paid for the repairs to his van by giving Nawrocki fraudulent VWO's. Thereafter, Faul brought phony work orders to the Mar-Lin garage on an average of once a month, and received payments from Nawrocki ranging from $200 to $1,400 monthly. The defendant-appellant Danny Pacella, an electrician at Garage No. 2 of the Motor Maintenance Division, also paid Nawrocki in 1979 with fraudulent VWO's for repairing his (Pacella's) private car. While a number of the VWO's purportedly contained the signature of other electricians at Garage No. 2, it was testified that Pacella either forged the other electricians' signature without authorization, or ordered one of his subordinate mechanics to approve of the work order by placing his signature on the VWO that Pacella had filled out.

Nawrocki further testified that in April of 1978, defendant Kovic met with Nawrocki at the headquarters of the Motor Maintenance Division and informed Nawrocki that "a guy downtown" was going to give the Mar-Lin business to another vendor unless he (the guy downtown) received 10 percent of Mar-Lin's gross city billings. The following morning, in response to Nawrocki's statement to Kovic that he could not afford to "go out-of business" Kovic replied that he did not want Mar-Lin to lose any money and suggested that Nawrocki add 10 percent to every bill submitted to the city in order to pay this new "johnny come lately," the man downtown. When asked how this would be accomplished, Kovic remarked that Pesha and Coleman would approve it

and that Pesha's and Coleman's approval of the 10 percent mark-up would be accomplished under Kovic's direction. Kovic explained that he would advise Nawrocki on the phone daily how much money was due, referring to the 10 percent mark-up, and would then arrange to meet with Nawrocki at 5:00 A.M. the following morning at Mar-Lin and receive the increased payment. Thereafter, from April of 1978 to the summer of 1979, Nawrocki made monthly payments to Kovic ranging from $3,000 to $15,000. During this period, approximately 30 percent of Mar-Lin's city billings were fraudulent, exclusive of the 10 percent added to the bills in order to accommodate the payments to Kovic.

In late April of 1978, Nawrocki arranged individual meetings with Pesha and Coleman. When Pesha and Coleman learned that Kovic was skimming 10 percent off the top of Mar-Lin's gross city billings, Coleman and Pesha each individually stated that they were unwilling to be shortchanged and would not continue to participate in the risks of the fraudulent scheme without receiving an increase in payments. Both Coleman and Pesha stated that they would no longer split with Kovic their respective 50 percent of the amount paid to Mar-Lin for the fraudulent billings but would keep the entire amount for themselves. When Nawrocki protested that the payment was excessive, Nawrocki testified that Coleman declared "it's either that or nothing."

In March of 1979, Cavale had a change of heart, and after having resigned as a co-owner of the garage at an earlier date now demanded that he again be paid a portion of the money received from the fraudulent billing scheme, or he (Cavale) would get out of the business altogether. Nawrocki agreed and suggested that Cavale rejoin Mar-Lin as a full partner in the enterprise, and further suggested that Cavale open and operate a second garage on Chicago's Northside in order to expand the fraudulent billing scheme of defrauding the Chicago Police Department. Cavale acquiesced, opened a new garage on the Northside and

increased his salary from $30,000 to $95,000 a year.

In March of 1979, Nawrocki and Cavale discussed the various percentages that Kovic, Coleman, Pesha, and Faul were receiving from the fraudulent billing schemes. When Nawrocki told Cavale that the partnership was now no longer making as much money, but was still existing, Cavale remarked "well, okay. We'll leave it that way."

Also, during March of 1979, Nawrocki received a phone call from the defendant-appellant Thomas Kurz, an accident investigator assigned to the Northeast side of Chicago, who explained that "Tony [Pesha] explained everything to me.... The deal is fine with me." Nawrocki agreed to split the proceeds from Kurz's fraudulent billings on a 50/50 basis, and invited Kurz to come on board, adding that Kurz would be dealing with his partner, Ron Cavale of the Northside enterprise, who knew all about the fraudulent billings and who would be advised of this conversation. That same day, Nawrocki spoke with Cavale and told him that Kurz was joining in and would send them some "body work" from the north side of the city. A short time later, Cavale told Nawrocki that Kurz was not as easy to deal with as Pesha because Kurz's fraudulent billing was not as extensive. However, Cavale continued to supply the authorizing signature for the Mar-Lin documents that supported Kurz's fraudulent billing until October of 1979, when Cavale left Mar-Lin after a dispute with Nawrocki over the division of profits from the partnership income.

In August of 1979, as a result of the commencement of the federal investigation into the fraudulent submission of billing to the Chicago Police Department, Kovic was removed from his position of authority, resulting in Mar-Lin's city business declining sharply. In early fall after the investigation had commenced, Nawrocki testified that he and Cavale discussed the options available to them in their business and adopted a "wait-and-see approach." Also at that time Nawrocki met with the defend-

ant Coleman, and Coleman suggested that now with Kovic out of the picture, it would be difficult, if not impossible, to obtain the proper authorization for the fraudulent billings, and that Coleman and Nawrocki should "quit writing" for a time, and recited that he would certainly miss his monthly $2,000 take. In late 1979, Nawrocki received a phone call from Danny Pacella, and Pacella informed Nawrocki that "they got us ... we forgot to think about the A & A Sheets." These records, entitled "Assignments and Attendance Sheets," were daily records maintained by the police department of the specific assignment of an officer to a specific police department vehicle on a day certain. Pacella explained to Nawrocki that the A & A Sheets would prove that specific vehicles were actually on the city streets and not under repair at the Mar-Lin garage on these days as set forth in the phony billings.

In support of Nawrocki's testimony, the government introduced a payment ledger which Nawrocki testified that he had maintained during the calendar year of 1978. Nawrocki testified that by the end of 1977 he felt that he was making so many payments to so many police department employees that he could no longer keep track of the payments in his head and was thus forced to set up a ledger to record them. The ledger reflects the following information:

During 1978, Terry Faul received monthly payments ranging from $150 to $1,420; Miles Coleman received monthly payments ranging from $1,958 to $4,905; Tony Pesha received monthly payments ranging from $3,530 to $4,645.

In explaining and authenticating this document, an expert government documents witness testified that Nawrocki's ledger displayed the imprints of a series of check numbers which corresponded to the dates and amounts of the checks which Nawrocki had made out when making the payments to the defendants.

Police Lieutenant Richard Sandburg, a lieutenant with the Internal Affairs Division of the Chicago Police Department and

a government witness, testified that for the purposes of the investigation and in preparation for trial he had examined the VWO's submitted by Mar-Lin, the accompanying Mar-Lin invoices, and "hiker books" and assignment and attendance sheets submitted by the City of Chicago. The documents referred to as "hiker books" are books maintained by Police Department officials at the respective police garages, and recited the dates on which particular police vehicles were transported from the garage to an identified private vendor. Lt. Sandburg testified that after examining these records he reconstructed and totaled the monthly billing of Mar-Lin Automotive during the relevant periods, and that their monthly billings steadily increased from an initial total of $5,000 in July of 1976 and reached a peak of $107,000 in the month of July of 1979. Further, Lt. Sandburg testified that after the commencement of the federal investigation and Kovic's removal as head of Motor Maintenance Division, these billings plunged from the $107,000 per month July '79 peak to $30,000 just three months later.

In analyzing the activity of the two accident investigators involved in this scheme, Kurz and Pesha, the government introduced testimony from two expert appraisers of automobile accident damage. These experts examined 14 of the accident billings submitted by Kurz and 25 of the billings submitted by Pesha, and after comparing these billings with the on-the-scene photographs of the accident damaged vehicles prior to the time they were transported to the Mar-Lin garage, they were able to ascertain that either the claimed repairs were wholly unnecessary or that the billings were grossly inflated beyond reason.

Ten individuals were named in a 72 count indictment returned by the January 1979 Special Grand Jury. The motions of those defendants seeking to dismiss and/or to sever were denied. Three defendants whose cases are not on appeal, entered pleas of guilty; one defendant (Nawrocki) as pointed out earlier turned states evidence and became the government's chief witness. During the five week trial, Faul, Kurz and Pacella testified and denied any involvement in the submission of fraudulent billings to the City of Chicago. On the other hand, defendants Kovic and Cavale declined to testify. All five defendants were convicted by the jury. These five defendants appealed their convictions to this court and this court consolidated the appeals.

## ISSUES

Issue 1: Did the district court err in denying the motions of those defendants who asked for severance on the grounds of prejudicial joinder pursuant to Federal Rule of Criminal Procedure 14 or improper joinder pursuant to Federal Rule Criminal Procedure 8(b)?

Issue 2: Was the evidence sufficient to support the convictions of Kovic and Cavale?

Issue 3: Did the remarks made by the trial judge during trial concerning the sentencing of one of the defendants to the charges of conspiracy who had previously pleaded guilty deprive Cavale of a fair trial?

Issue 4: Do any other grounds for reversal exist?

*Issue 1: Joinder/Severance*

The defendants Faul, Kovic, Kurz, and Pacella claim that the trial court erred in denying their motions for severance. Relying upon Federal Rule of Criminal Procedure 8(b), these defendants assert that they were prejudicially joined with the other defendants in the government's indictment. Rule 8(b) provides for the joinder of defendants under the following certain circumstances:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all the

defendants need not be charged in all counts.

Fed.R.Crim.P. 8(b).

Basically, the issue pertinent in the instant case is whether the evidence, viewed in a light most favorable to the government, demonstrates that there were separate and distinct mail fraud schemes having similar goals but not part of a single criminal enterprise as the defendants contend, or whether these defendants participated in a series of acts or transactions which were all part of the same criminal enterprise as maintained by the government.

The defendants take the position that the government's evidence demonstrates only that various groups of defendants independently entered into five separate agreements with Nawrocki to commit similar types of fraud against the City of Chicago. The defendants assert that where the only nexus between two defendants joined for trial is their participation in a similar offense with a common third defendant, *the same transaction or series of transactions* test of Rule 8(b) is not satisfied. Moreover, the defendants note that during the government's case, the government was repeatedly required to announce against which defendant or defendants the particular evidence or testimony was being submitted. Since the overwhelming mass of evidence used to prove the guilt of the co-defendants did not pertain to each individual defendant in each particular instance, the defendants insist that the jury was unable to segregate the evidence into separate intellectual boxes. In a case such as this, where the evidence is both massive and complex, the defendants argue that the trial court erred when it refused to allow each defendant a separate trial. We disagree.

"Rule 8 is construed broadly to allow liberal joinder and thereby enhance the efficiency of the judicial system." *United States v. Isaacs*, 493 F.2d 1124, 1158 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). "Rule 8(b) strikes a compromise between each defendant's right to have his own guilt considered separately, and the practical benefit to the government and the court of a consolidated proceeding." *United States v. Martinez*, 479 F.2d 824, 827–28 (1st Cir. 1973). As the language of Rule 8(b) demonstrates, the test for joinder is whether the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions." Case law reveals that "the word transaction contemplates a series of many acts depending not so much upon immediateness of their connection as upon their logical relationship." *Isaacs*, 493 F.2d at 1158. "The test of whether the acts of the defendants are part of a series of transactions depends upon the existence of a common plan." *United States v. Scott*, 413 F.2d 932, 935 (7th Cir. 1969), *cert. denied*, 396 U.S. 1006, 90 S.Ct. 560, 24 L.Ed.2d 498 (1970). A common plan among these many defendants to defraud the City of Chicago through the fraudulent scheme of submitting false billings to the Chicago Police Department with Nawrocki as the central figure and several defendants sharing in the profits from the same billings has been established here.

We find the holding of the Ninth Circuit in *United States v. Patterson*, 455 F.2d 264 (9th Cir. 1972), to be persuasive. In *Patterson*, the defendant and an individual named Aquino were charged with the same offense in separate counts of the same indictment. The indictment charged that on three separate occasions the mails were used to further a scheme to defraud individuals who repeatedly advertised in the Yellow Pages of the local phone book. The evidence introduced by the government revealed that these three mailings were virtually identical. In each case a bill, statement or invoice in the form of a data processing card was mailed to those business firms who regularly used the Yellow Pages for advertising purposes. These bills or invoices required payment of either $74.00 or $77.00 to a business enterprise known as "Classified Directory." Recipients of these mailings who paid the bills all stated that they thought they were paying for previously ordered classified advertising and had no knowledge that the bills were from an un-

related source. A third party, Mortillaro was also charged, but entered a plea of guilty before trial.

In denying the defendant's motion for a new trial based upon misjoinder, the Ninth Circuit ruled that the evidence was sufficient to find that a common *modus operandi* was employed in each scheme and therefore joinder was proper.

> Review of the indictment and the evidence introduced reveals that the joinder of appellant and defendant Aquino was proper. This evidence, supporting the schemes alleged in the indictment, revealed that the schemes were basically the same.
>
> Moreover, Mortillaro is charged in every count of the indictment, providing a common link between all of the defendants. Therefore, it cannot be said that there was a joinder of totally unrelated defendants charged with distinct, unrelated crimes. Rather, it appears that appellant and the others were charged with the same basic fraudulent scheme which they jointly and individually executed within a six-month period.

455 F.2d at 266.

■ The facts in *Patterson* are strikingly similar to the case at bar. The evidence introduced at trial clearly demonstrates that a common plan was employed by all of the defendants herein to defraud the City of Chicago through the submission of fraudulent billings to the Chicago Police Department. The evidence supports the finding that the schemes alleged in the indictment were the same. Furthermore, here, as in *Patterson*, a third-party, Nawrocki, was charged in the indictment and provided the common link between all of the defendants. In a case such as this one, where multiple defendants are charged with employing virtually identical schemes, and where all of these fraudulent schemes are linked together by a common third party (Nawrocki), joinder is proper. Therefore, in light of the need for efficiency in our court system, the convenience of the witnesses and parties, the demands of financial exigency and the fact that our examination of the record

revealed no taint of prejudice we hold that the trial court did not abuse its discretion in joining the defendants' cases for trial under Rule 8(b).

The defendants-appellants Faul, Kurz, Kovic, and Pacella also claim that the trial court abused its discretion in denying their motions for severance under Rule 14 of the Federal Rules of Criminal Procedure. Rule 14 provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Fed.R.Crim.P. 14.

"It [is] within the sound discretion of the trial judge as to whether the defendants should be tried together or severally . . . ." *Opper v. United States*, 348 U.S. 84, 94, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954). "The denial of a severance motion will not be disturbed on appeal absent abuse of discretion by the trial court," *United States v. Black*, 684 F.2d 481 at 484 (7th Cir. 1982), "or plain error affecting substantial rights." *Isaacs*, 493 F.2d at 1159. Each defendant argues that the trial court abused its discretion in denying severance under Rule 14 because the massive and complex quantity of evidence introduced at trial made it almost impossible for the jury to separate the evidence as it relates to each defendant when determining that individual's innocence or guilt.

The defendants are correct in stating that this court has emphasized that:

> The question of whether a joint trial infringes upon the defendant's right to a fair trial depends on whether it is within the jury's capacity, given the complexity of the case, to follow admonitory instructions and to keep separate, collate and appraise the evidence relevant only to each defendant.

*United States v. Hedman*, 630 F.2d 1184, 1200 (7th Cir.), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1980).

■ While it is true that there was a great deal of evidence admitted at trial to establish the guilt of all the defendants, the defendants' allegation that the "spill-over" effect of the charges against the other defendants left the jury unable to fulfill its duty to determine the guilt of each defendant is unpersuasive. Initially, it should be noted that the evidence at trial revealed one definite scheme or pattern of activity to defraud the City of Chicago through the submission of false work orders and fraudulent billings. Moreover, as in the case of *United States v. Shelton*, 669 F.2d 446 (7th Cir. 1982), "the district judge gave appropriate limiting instructions during the trial when necessary . . . and carefully instructed the jury in this regard." *Id.* at 461. Indeed, in the instant case the presiding judge not only instructed the jury during trial to give separate consideration to each defendant, and frequently reminded the prosecution to identify the defendant against whom the evidence was introduced but also repeatedly expressed her willingness to give whatever instructions defense counsel deemed necessary to "compartmentalize the evidence against the defendants." The court stated:

> I will identify the evidence, the documentary evidence, the witnesses, the counts. I will stay here for two days telling the jury so that the jury can have that physically in their hands when they go back to deliberate. So that problem is cured.

While no defense counsel provided instructions that identified the evidence to each defendant, the trial court did instruct "the jurors that they were to consider the evidence as to each defendant and each count separately," *Black*, at 484, in the following language:

> It is necessary, however, that the government prove beyond a reasonable doubt that a defendant to that scheme was aware of the common purpose and was a willing participant with the intent to advance the purpose of the scheme. . . . In summary, to sustain the charge of mail fraud the government must prove all of the following propositions with respect to *each* defendant . . .

> If you find from your consideration of all of the evidence as to a particular count that all of these propositions have been proved beyond a reasonable doubt as to a particular defendant, then you should find that defendant guilty of that count.

> On the other hand, if you find from your consideration of all of the evidence as to that count that any of these propositions has not been proved beyond a reasonable doubt as to a particular defendant, then you must find that defendant not guilty of that count . . . .

Indeed, none of the defense counsel offered objections to this instruction by the trial judge nor were objections made to virtually identical instructions relating to the charges of extortion and attempted extortion. Thus, it can only be inferred from the absence of objections to these instructions during or after trial that counsel for the defendant acquiesced in the accuracy of the instructions as given. Moreover, during the trial, when introducing evidence as to one defendant, the prosecution clearly identified that evidence as going to the guilt of that individual defendant. Since a review of the record substantiates that the instructions given to the jury were clear and unambiguous as to the innocence or guilt of each and every defendant, "to say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict." *Opper*, 348 U.S. at 95, 75 S.Ct. at 165. We see no such proof in the record.

■ Thus, we hold and reaffirm prior case law that where defendants are properly joined under Rule 8(b), and in the absence of an abuse of discretion by the trial court, where it is well within an intelligent jury's capacity to follow admonitory instructions and weigh, sift, separate and appraise the evidence relevant to each defendant, severance under Rule 14 is neither necessary nor appropriate. This is especially true where, as here, the parties have participated in the selection of the jury through extensive and exhaustive voir dire examination, and in this fashion have ensured the intelligence and reason of the jurors chosen.

*Issue 2: Fair Trial/Due Process*

██ Defendant Cavale alleges on appeal that the district court deprived him of a fair trial and due process of law because of allegedly improper and coercive remarks made by the trial judge which threatened the defendant with a substantial increase in sentence if he testified on his own behalf. The remarks by the trial court with which the defendant takes issue arose out of a discussion in open court, but in the absence of the jury, as to whether one of the co-defendants, Mr. Pacella, could subpoena another co-defendant, John Balzano, who had previously pleaded guilty. In discussing this question, the trial judge stated:

THE COURT: How can I tell you that he [Balzano] has nothing to fear? I am telling you that if I perceive he perjured himself, I am going to add substantially to his sentence. We are already talking about enormous sentences, and when I say substantial, I mean this man, whoever takes the stand, is facing a significant sentence.

Initially, we note that it is entirely proper for a trial judge to warn a potential witness of possible sanctions if the judge perceives that the witness may intend to perjure himself. However, it is defendant Cavale's position that the above-quoted remarks were improper and prejudicial, and operated to persuade him (Cavale) to refrain from testifying on his own behalf.

The difficulty with the defendant's argument is that the record must be read as a whole, and the defendant has singled out one portion of the transcript and ignored other parts of the record which place the court's statement in its proper context. For example, shortly thereafter, the next day, at a point in the trial when Cavale could still have decided to testify, the court, when defense counsel alerted the judge to Cavale's uncertainty and fear, emphasized that the remarks in question were not directed at Cavale, but at Balzano, a police department employee who had already pleaded guilty. In the following exchange with Cavale's counsel, the court noted:

THE COURT: In that situation we are considering the government's right to bring a rebuttal witness because the government, knowing what they know about the case, indicated that they would expect that if Pacella took the stand, he would try to lie his way out of that, and that is the context in which we are talking about the whole situation.

The question is, was the government entitled to bring Balzano out to guard against the possibility that Pacella was going to take the stand and lie. Mr. Pacella's attorney quite properly wanted a rule on that before his client took the stand.

Now that was the context in which those remarks were made.

MR. SAMUELS: True enough.

THE COURT: They weren't made against your client [Cavale].

The court then stressed that defendants Cavale and Balzano were in completely different situations because Balzano's acts as a participant in a fraudulent scheme took place while employed in a position of public trust by the police department, and thus rose to a higher level than mere fraud and the judge specifically stated that his (Balzano's) actions constituted a "violation of the public trust." Indeed, the trial judge, almost bending over backwards in trying to be fair, was so concerned that her remarks on sentencing may have been misinterpreted by defendant Cavale that she again later raised the issue *sua sponte* with the defendant's attorney, because of the attorney's ill-conceived notion that the judge has predisposed herself to Cavale's guilt or innocence:

I certainly have made up my mind not at all with respect to the guilt or innocence of your client. I have made up my mind not at all with respect to perjury. So if your client is seriously depriving himself of the opportunity to testify and deny Mr. Nawrocki's statements based on my statements, *I would urge you to seriously reconsider that and recounsel your client. . . .*

Now I think I told you yesterday, and I will tell you again, that the remarks about substantial sentences [were] in connection with violation of the public trust kind of case and that your client was the extortee and not the extortor and I would not consider your client as being in the same category as public officials, so do reconsider. I am telling you straight out, there is nothing to your motion in terms of me having formulated an idea about your client or anybody's guilt.

■ The above-quoted remarks clearly reveal that defendant Cavale was not denied due process or a fair trial by the remarks by the trial judge. In fact it is very clear that Judge Getzendanner's remarks were not addressed to the defendant, but rather were addressed to a potential prosecution witness. Further, in response to her perception that defendant Cavale through his attorney might have misinterpreted her remarks, the court took the further step of raising the issue with the defendant's attorney *sua sponte*. These later remarks reflect her concern and clearly reveal that the trial judge was not predisposed to the defendant's guilt and was doing all in her power to ensure that the defendant received a fair trial. Moreover, it is also clear that unless Cavale had a guilt complex as to the remarks of the trial judge and was thinking of employing perjury to extricate himself from the fraudulent scheme he had involved himself in, he had no need to fear an increased sentence and the judge's remarks should have been of no consequence to him. Therefore, from our examination of the record, we hold that the remarks of the trial judge were not addressed to Cavale, were not prejudicial and did not deny him (Cavale) a fair trial.

*Issue 3: Sufficiency of the Evidence*

Defendants Cavale and Kovic further challenge their convictions on the grounds that the evidence failed to prove beyond a reasonable doubt that these defendants knowingly participated in any scheme to defraud the Chicago Police Department. Defendant Cavale does not challenge the evidence as to the existence of a scheme or schemes to defraud, but rather challenges this evidence with regard to Cavale's knowledge of the scheme. Defendant Cavale asserts that mere association with a criminal venture is not sufficient to establish knowledge, but that the evidence must establish actual knowledge of sufficient elements of the criminal enterprise. Defendant Cavale asserts that little apart from the testimony of co-defendant Nawrocki establishes the inference that Cavale knew of the schemes which Nawrocki had devised. Moreover, the defendant asserts that under critical examination the testimony of Nawrocki becomes even more suspect. Defendant Kovic also attacks the sufficiency of the evidence which was introduced at trial to convict him. It is Kovic's contention that the trial court improperly admitted statements made by his co-conspirators, and that the evidence introduced against him was insufficient to support a finding of guilty.

"The general rule of application is that the verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). The testimony of Richard Nawrocki established that Cavale participated in the fraudulent scheme in the following fashion: (1) Cavale attended the first meeting in 1976 at which Kovic guaranteed that Mar-Lin would get a city contract; (2) Cavale was informed of Coleman's plan to split the proceeds of fraudulent billings and stated that this was all right with him; (3) Cavale told Nawrocki that Pesha's plan to split the proceeds of the fraudulent billings would be all right as long as Mar-Lin did not have to do the work; (4) A number of checks were written by Cavale to obtain the money used in paying off the other defendants; (5) Cavale purchased the accident repair forms to submit in support of the fraudulent bills; (6) Indeed, Cavale bought back into the illegal scheme by opening a new branch of Mar-Lin Automotive on Chicago's Northside so that he could "get a piece of the action."

Nawrocki's testimony was corroborated by overwhelming circumstantial evidence, including his ledger and checks. Furthermore, the two government experts on accident damage testified after inspecting photographic exhibits as to the lack of actual identifiable damage to automobiles that Cavale purportedly worked on. The fraudulent work orders and inflated billings were also made out by Cavale. Indeed, he became so proficient in the criminal enterprise that he opened his own branch operation on Chicago's Northside. Finally, the government's evidence showed that Cavale signed at least 12 of the inflated accident invoices that Kurz had fabricated.

▪ In conclusion, when viewed in the light most favorable to the government, a review of the testimony of all the witnesses as well as the documentary and circumstantial evidence is more than sufficient to support Cavale's criminal conviction for mail fraud and extortion beyond a reasonable doubt.

▪ Similarly, the evidence is sufficient to support the conviction of defendant Kovic. The defendant attacks his conviction on the grounds that the trial court improperly admitted statements made by alleged co-conspirators. It is well established that a hearsay statement is admissible under the Federal Rules of Evidence, Rule 801(d)(2)(E), if the trial court finds by the preponderance of the evidence that "[t]he statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in the furtherance of the conspiracy." *See United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

Applying this principle to the case at hand, it is without question that the government's independent evidence linked Kovic to the mail fraud scheme of submitting fraudulent work orders and billings and was more than sufficient to render the out-of-court statements of his co-conspirators during the course and in furtherance of the conspiracy admissible against him under Rule 801. Kovic, as the "king-pin" of the operation, helped to initiate, organize and promote the fraudulent scheme, and his approval was necessary before any payments could be made to Mar-Lin Automotive. Further, other evidence established that Kovic participated in the bidding process, and the lowering of Mar-Lin's bid which led to the Mar-Lin acquisition of a city contract, and expressed his willingness to sign the invoices which were essential to the success of the fraud. In the years 1976–1979, Kovic was an active daily participant with the vast majority of Mar-Lin's fraudulent billings. Kovic increased his percentage of the take and personally met with his co-conspirator Nawrocki on almost a daily basis to collect his money. Indeed his approval was necessary to collect the increased 10% payments. Also, when Kovic was removed from his position as Chief of the Motor Maintenance Division Mar-Lin's business declined over $70,000 per month. The inference to be drawn from this evidence is that defendant Kovic played a central role in the fraudulent scheme, closely manipulating and monitoring the phony Mar-Lin billings, awarding the illegal Mar-Lin contract, increasing his own share and approving the take of the others, and thus actively participating in the overall conspiracy and actual defrauding of the City of Chicago. Therefore, we hold that the testimony of Richard Nawrocki, in conjunction with the circumstantial and documentary evidence introduced by the government is sufficient to support the finding of the trial court that Kovic was guilty of mail fraud beyond a reasonable doubt.

*Issue 4: Other Arguments*

Finally, defendants Faul and Pacella raise other issues which they contend warrant this court's overturning the finding of the lower court. Defendant Faul claims that the City's mailings of the checks to the Mar-Lin garage did not constitute an essential element of the mail fraud scheme, and thus the mailings cannot be shown to come within the purview of the federal mail fraud statute. We refuse to agree with this position.

**1112**

It strains credibility to believe that the city payment checks which were mailed to Mar-Lin were "innocent material," as the defendant Faul now claims. The payment by the City of Chicago by check was the final step in the fraudulent enterprise, and the checks were clearly essential to the final execution of the scheme and thus come within the scope of the mail fraud statute. Therefore, we agree with and affirm the finding of the trial court.

Defendant Pacella claims on appeal that the government attempted to mislead the jury on a significant evidentiary point, the date on which Pacella acquired a 1973 Plymouth, which Nawrocki repaired in exchange for fraudulent VWO's. Pacella argues that it was improper for the prosecutor in the presence of the jury to raise an issue with Pacella concerning a question asked of Nawrocki by Pacella's counsel after his counsel withdrew the question before he (Nawrocki) answered. This argument, however, ignores the fact that Pacella's counsel, and not the government had initially opened the door on the line of questioning concerning Pacella's ownership of the 1973 Plymouth. However, "[w]hen a party opens up a subject ... he cannot complain on appeal if the opposing party introduces evidence on the same subject." *United States v. Bolin*, 514 F.2d 554, 558 (7th Cir. 1975). The trial court, out of the hearing of the jury, ruled the questioning of Pacella concerning the 1973 Plymouth proper, stating that the defendant's cross-examination of Nawrocki made it appear to the judge and the jury as if the auto in question was never really in existence. The court stated, "The government is certainly entitled to take advantage of [the defendant's] cross-examination of Mr. Nawrocki." Having opened up this line of questioning, the defendant cannot now attack the government for explaining the subject he presented to the jury but subsequently attempted to withdraw. It is this type of unexplained action, calculated by trial attorneys to cause speculation by a jury, which frequently causes difficulty in jury deliberations and all too often results in mistaken jury verdicts. Therefore, we hold

the government cross-examination was proper and affirm the finding of the district court.

By the court, the decision of the District Court for the Northern District of Illinois, Eastern Division, is AFFIRMED.