**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Anthony F. PIPITO and Cheryl L. Kane, a/k/a Cheryl L. Pipito, Defendants–Appellants.**

Nos. 85–3129, 85–3130.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1986.

Decided July 20, 1987.

Robert E. Sutton, Milwaukee, Wis., for defendants-appellants.

John A. Franke, Organized Crime & Racketeering Sec., Milwaukee, Wis., for plaintiff-appellee.

Before POSNER, Circuit Judge, RIPPLE, Circuit Judge, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

Defendants-appellants Anthony and Cheryl Pipito (hereinafter Anthony and Cheryl) appeal their convictions on various drug charges. Anthony was convicted by a jury of engaging in a continuing criminal enterprise (21 U.S.C. § 848), possession with intent to distribute cocaine (21 U.S.C. § 841(a)(1)), interstate travel to facilitate an unlawful activity (18 U.S.C. § 1952), and utilizing a telephone to facilitate an underlying cocaine conspiracy (21 U.S.C. § 843(b)). A conviction on a conspiracy count was subsequently vacated. Anthony was given a 50 year term of imprisonment on the continuing criminal enterprise charge and 121 years on the remaining counts. Cheryl, Anthony's wife, was convicted after a bench trial on one count of conspiracy (21 U.S.C. § 846) and one count of possession with intent to distribute cocaine (21 U.S.C. § 841(a)(1)). She was sentenced to a five year probationary period, fined $5,000 and is required to perform 800 hours of community service. After considering the various arguments raised by the defendants, we affirm the rulings of the district court.

On October 24, 1984 Chief Judge Reynolds of the Eastern District of Wisconsin authorized the interception of telephone

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

conversations from the residence of Anthony. This was done from October 25 to November 30, 1984. It was on the basis of these intercepted conversations that Anthony and Cheryl were arrested. Subsequent to their arrest search warrants were issued for Anthony's residence as well as for the residence of his brother Peter Pipito. A safe deposit box was also searched; 2.6 kilograms of cocaine and $319,735 was recovered.

Most of the evidence incriminating Anthony came from 156 intercepted telephone conversations from his telephone covering 288 recorded hours. The government outlines conversations where Carlo, Edgar, "Good Stuff," and Kiko were identified as cocaine suppliers from Florida (Gov't. Ex. 256, 267, 282, 308). It became apparent that cocaine was secured from Florida and brought to Milwaukee where it was distributed in quantities ranging from one-quarter of an ounce to four ounces at Anthony's condominium or at a designated site (Gov't. Ex. 339–40, 354–55, 257–58, 359–60, 261). Law enforcement officials often witnessed the actual distributions take place after learning about them from the telephone conversations. Anthony himself estimated he distributed five to six kilograms of cocaine per month and that his annual income was 1.2 million dollars (Gov't. Ex. 347, 348, 268, 344).

As for Cheryl Pipito, she moved to sever her trial and the motion was granted. Yet the same tapes and evidence collected and seized from Anthony's condominium were used against Cheryl. The conversations from Anthony's telephone established that on November 24 and 28, 1984 Cheryl helped Anthony package cocaine and on November 25 she helped tally cash proceeds from the sale of cocaine. She was also seen accompanying Anthony on November 27 when he distributed cocaine to street dealers.

### Anthony's Arguments

Anthony raises nine arguments on appeal. Most of them are totally unsubstantiated and all of them, ultimately, must be rejected. His first argument is that the

warrant issued to the police by Chief Judge Reynolds was tainted because it was "a monument to hearsay, innuendo, suspicion, speculation, and uncorroborated allegations" (Brief p. 6). A "totality of circumstances" test should be employed in reviewing the sufficiency of search warrant affidavits. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A ... "determination of probable cause should be paid great deference by reviewing courts." *Spinelli* [*v. U.S.* ], *supra*, 393 U.S. [410], at 419, 89 S.Ct., at [584], 590 [21 L.Ed.2d 637 (1969) ]. "A grudging or negative attitude by reviewing courts toward warrants," [*U.S. v.* ] *Ventresca*, 380 U.S. [102], at 108, 85 S.Ct. [741], at 745 [13 L.Ed.2d 684 (1965) ], is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense manner." *Id.*, at 109, 85 S.Ct., at 746.

*Id.* 103 S.Ct. 2331.

Anthony fails to detail any specifics as to why the warrant was constitutionally insufficient. Anthony claims it is "obvious" from reading the affidavit that there is no way to vouch for the reliability of the information from the unidentified confidential sources. Yet he advances no analysis of the warrant's language that would lead to such a conclusion. In contrast, the government notes the informants had been used by the FBI previously and none had been known to give false information. The bottom line here is that we cannot rule the district court's issuance of the warrant to be constitutionally offensive on the basis of Anthony's conclusory, unsubstantiated allegations considering *Gates* instructs us to pay great deference to the ruling of the district court on this matter.

Anthony's second argument is that he was unconstitutionally detained from the time of his arrest until his sentencing.

He claims there should have been a review of his detention during the ten month period between his arrest and sentencing. He attacks the constitutionality of the Bail Reform Act of 1984 (the Act), 18 U.S.C. § 3141 *et seq.*, and places particular emphasis on the rebuttable presumption found at 18 U.S.C. § 3142(e). Suffice it to say, the Bail Reform Act of 1984 has been held constitutional by the United States Supreme Court in *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Indeed, much of the reasoning advanced by the Supreme Court in *Salerno* was advanced by the Seventh Circuit earlier in *United States v. Portes,* 786 F.2d 758, 766–68 (7th Cir.1985).

The provisions of the Act were applied properly in this case. Following two hearings in December of 1984 a magistrate issued a detention order with an explanation of the reasons why he thought the detention of Anthony was necessary to protect the community and insure his presence at trial. Anthony failed to seek a revocation of this order pursuant to 18 U.S.C. § 3145(c). Instead he filed a petition for a writ of habeas corpus while the criminal action at bar was pending. After reviewing the magistrate's recommendations, the district court decided that habeas petitions were civil in nature and should be filed as separate civil actions. The district court also noted that Anthony should have followed the review procedures found at 18 U.S.C. § 3145(c). The district court did not err in refusing to entertain Anthony's petition for habeas corpus relief (see 28 U.S.C. § 2241). Further, on the appeal before us, Anthony fails to advance any reason why his detention, considering the facts surrounding his case, was wrongful. We see no reversible error here.

■ Anthony's third argument is that he was assaulted by the FBI in order to obtain his palm prints. Anthony physically refused to have his prints taken, forcing the government to file a motion to compel his submission to having the prints taken. Anthony does not advance any concrete, recognizable constitutional theory as to why the forced taking of his palm prints de-prived him of his constitutional rights. For example, no deprivation of his Fifth Amendment privilege against compelled self-incrimination or Fourth Amendment right not to be subjected to unreasonable searches is alleged. Perhaps this is because these arguments have all been rejected in the past. Principally, in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) the Court established that the Fifth Amendment privilege against compelled self-incrimination is a testimonial privilege and that the taking of blood samples or fingerprints is not equivalent to the taking of communicative testimonial evidence.

> It is clear that the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746. On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture.[8] The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling "communications" or "testimony," but that compulsion which makes a suspect or accused the source of "real or physical evidence" does not violate it.

86 S.Ct. at 1832. (footnote omitted).

Also rejected in *Schmerber* was the notion that the type of bodily display we are concerned with here constitutes an unreasonable search and seizure within the meaning of the Fourth Amendment. See 86 S.Ct. 1833–36. Anthony cites literally no case law supportive of his argument that the government's forced taking of his palm prints amounted to battery or physical assault so grievous it reached constitutional dimensions. As the First Circuit aptly stated in *Appeal of Maguire,* 571 F.2d 675, 677 (1st Cir.1978), "while it may not enhance

the image of justice to force a witness kicking and screaming ... the choice has been made by the witness, not the court." There is no reason to embrace Anthony's argument in this area.

■ Anthony's next argument is that the prosecution's pretrial superseding indictment in this case was vindictive and constituted reasonable error. Anthony asserts the superseding indictment was not based on any newly found information and was returned a month after his initial detainment. Anthony suggests the reason for the superseding indictment was that he vigorously asserted his pretrial constitutional rights by seeking to avoid having his palm prints taken and attempting to secure the release of his assets confiscated by the government. He concludes these were "extraordinary procedural events ... to the likely embarrassment of the government." (Brief p. 11). In *United States v. Goodwin*, 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982) the Supreme Court stated:

> The imposition of punishment is the very purpose of virtually all criminal proceedings. The presence of a punitive motivation, therefore, does not provide an adequate basis for distinguishing governmental action that is fully justified as a legitimate response to perceived criminal conduct from governmental action that is an impermissible response to noncriminal protected activity. Motives are complex and difficult to prove. As a result, in certain cases in which action detrimental to the defendant has been taken after the exercise of a legal right, the Court has found it necessary to "presume" an improper vindictive motive. Given the severity of such a presumption, however—which may operate in the absence of any proof of an improper motive and thus may block a legitimate response to criminal conduct—the Court has done so only in cases in which a reasonable likelihood of vindictiveless exists.

*Id.* at 102 S.Ct. at 2488.

The *Goodwin* court also stated: "A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct.[14]" 102 S.Ct. at 2493. Footnote 14 reads in pertinent part: "To presume that every case is complete at the time an initial charge is filed, however, is to presume that every prosecutor is infallible—an assumption that would ignore the practical restraints imposed by often limited prosecutorial resources." *Id.*

In short, Anthony fails to persuade us that a reasonable likelihood of vindictiveness exists in this case in regard to the prosecution's filing of a superseding indictment. There is no reason to conclude Anthony's refusal to have his palm print taken irritated the government to such an extent that the government thought retaliatory measures appropriate (perhaps they had read *Schmerber, supra.*) Anthony also fails to persuade us that his desire to secure government confiscated funds resulted in governmental vindictiveness. There is simply nothing so unusual concerning the pretrial matters in this case, as Anthony suggests.

■ Anthony raises several other arguments which we can dismiss quickly. First, as referred to above, he claims that funds belonging to him were wrongfully confiscated resulting in an inability on his part to pay his attorney's fees. He alleges Sixth Amendment and Thirteenth Amendment violations here. We note Anthony does not assert he was not represented because of this problem. Initially he was represented by attorney Franklyn Gilbert. Subsequently, he was represented for a short transition period by Robert Lerner. Finally, the present attorney of record, Robert Sutton, became his counsel. At one point Sutton actually claimed a third party had retained him to represent Anthony (Doc. 81, Doc. 83, and Affidavit of Robert E. Sutton). Anthony's Sixth Amendment right to effective assistance of counsel argument makes little sense because he was always represented, and most of the time by counsel of his choice. There is no claim of prejudice or error at trial which would lead to a valid Sixth Amendment claim. Anthony also claims his inability to secure

confiscated funds to pay his counsel amounted to a Thirteenth Amendment violation. This argument is ridiculous to the point of disturbing. Even more disturbing is attorney Sutton's comment at oral argument that his efforts were less because payment was uncertain. Professional responsibility and dignity should not be so easily discarded in the pursuit for personal profit.

Anthony argues the district court did not allow him a reasonable time to prepare his defense. In this argument, covering less than a page, he notes that he was not allowed to listen to *all* of the 200 hours of telephone conversations the government secured from his telephone. On a related front, he claims the government was wrongfully allowed to selectively and arbitrarily edit the tapes. We note the tapes were available to Anthony after his arrest but that (at least) initially he made no effort to review them. The government actually had to encourage him to review the tapes in a January, 1985 letter. Ultimately, the court granted a continuance on May 10, 1985 so that Anthony could review the tapes. Anthony fails to substantiate any material evidence introduced at trial which surprised or prejudiced him because he was not allowed or given time to review a particular tape. Nor does he substantiate any claim that the jury was misled due to the government's editing of the tapes. The district court allowed Anthony to offer unpresented portions of the tapes presented by the government if he deemed they could be helpful. In sum, Anthony presents no reason for reversal in this area.

Finally, Anthony claims the district court erred in not granting his motion for severance of his trial following the testimony of his brother and co-defendant, Peter Pipito. Once again, Anthony fails to substantiate how Peter's testimony "clearly and convincingly" implicated him. He does not allege the existence of antagonistic defenses between the two of them. Only conclusory statements are advanced. Indeed, despite the complexity of the severance issue, Anthony's argument in this area covers but one page. Broad allegations and conclusions of prejudice are simply not sufficient to justify reversal. An-

thony has mastered the dubious art of raising boilerplate arguments which could theoretically constitute reversible error, yet providing no specifics which would lead a court to consider embracing these arguments. His conviction is affirmed.

### Cheryl's Arguments

Cheryl advances two arguments on appeal. Her first argument is that her trial should have been severed from Anthony's before trial because there was a gross disparity of evidence (quantitatively and qualitatively) against them. She claims the failure to grant her a severance compelled her to waive her right to a jury trial and "risk" a bench trial. In *United States v. Cavale*, 688 F.2d 1098 (7th Cir.1982) we stated, by reviewing past case law, that:

> "It [is] within the sound discretion of the trial judge as to whether the defendants should be tried together or severally...." *Opper v. United States*, 348 U.S. 84, 94, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954). "The denial of a severance motion will not be disturbed on appeal absent abuse of discretion by the trial court." *United States v. Black*, 684 F.2d 481 at 484 (7th Cir.1982), "or plain error affecting substantial rights." *[United States v.] Isaacs*, 493 F.2d [1124] at 1159 [7th Cir.1974].

688 F.2d at 1107.

Nothing advanced by Cheryl rises to a level which would lead us to believe constitutional error was committed here. Cheryl talks of a prejudicial disparity of evidence between her and Anthony but she does not specifically demonstrate this disparity and why it would have forced her to choose a separate bench trial. Further, we are given no particulars as to why or how she may have been unfairly prejudiced by the separate bench trial. In sum, there is no error of constitutional proportions advanced.

Cheryl's final argument is that there was insufficient evidence to sustain her conviction for conspiracy to distribute and possession with intent to distribute cocaine. She claims her testimony that she never possessed or distributed cocaine was never rebutted. She states that assuming *arguendo* she had knowledge of the conspiracy Anthony was engaged in, there was

no evidence she ever reached an agreement with Anthony to cooperate in the crime. Our standard of review in this situation is whether the evidence, viewed in a light most favorable to the government, could have persuaded any rational trier of fact of Cheryl's guilt beyond a reasonable doubt. See *United States v. Perry*, 747 F.2d 1165, 1168 (7th Cir.1984); *United States v. Moya*, 721 F.2d 606, 610 (7th Cir.1983). There was evidence presented that Cheryl participated in the packaging and storage of cocaine as well as the counting of the proceeds from its sale on November 24, 25, and 28, 1984. This was ascertained from the tapes from Anthony's telephone secured by the government. There was also the physical surveillance of Cheryl on November 27, 1984 by law enforcement officials when Cheryl accompanied Anthony as he distributed cocaine to street dealers. The evidence, viewed in a light most favorable to the government, is sufficient to sustain her conviction.

The convictions of both defendants in this case are hereby

AFFIRMED.