UNITED STATES of America, Plaintiff-Appellee,

v.

James J. REAGAN, Defendant-Appellant.

Nos. 81–1886, 81–2811.

United States Court of Appeals, Seventh Circuit.

Argued June 9, 1982.

Decided Aug. 16, 1982 *.

Opinion Dec. 8, 1982.

Certiorari Denied Dec. 6, 1982. See 103 S.Ct. 492.

---

\* This appeal was originally decided by unreported order on August 16, 1982. *See* Circuit Rule

35. The court has subsequently decided to issue the decision as an opinion.

Allan A. Ackerman, Chicago, Ill., for defendant-appellant.

Howard M. Pearl, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill. (Robert Walter Tarun, Chicago, Ill., of counsel), for plaintiff-appellee.

Before WOOD and COFFEY, Circuit Judges, and CAMPBELL,** Senior District Judge.

PER CURIAM.

Defendant appeals from his conviction on eight counts for participating in a land fraud scheme in violation of 18 U.S.C. §§ 2 and 1341, and the denial of his motion for a new trial. Defendant argues that the Government failed to correct allegedly false testimony of its principal witness and made numerous improper statements during closing argument. For the reasons set forth below, we affirm the decisions of the district court.

I

On October 23, 1980, defendant James J. Reagan, an attorney, was indicted and charged with aiding and abetting Richard D. Link in a scheme to defraud Link's employer, the Union Oil Company of California, of substantial profits from the sale of real estate which Link was entrusted to sell on behalf of Union Oil. The following facts are not in dispute.

Between 1967 and 1977, Link was employed as a real estate representative for Union Oil and was responsible for selling certain obsolete service stations owned by Union Oil. Link had authority to obtain appraisals, recommend selling prices, advertise the properties, negotiate with prospective buyers, and handle closings. All purchase agreements were subject to approval by Union Oil.

In 1967, Link sought to retain defendant in connection with an unrelated property transaction. At that time, Link told defendant that because of his position with Union Oil he could purchase Union Oil properties and resell them at a personal profit

** The Honorable William J. Campbell, United States Senior District Judge for the Northern District of Illinois, is sitting by designation.

and asked defendant whether he knew of any way to accomplish this type of transaction.

The fraud at issue was perpetrated through the use of land trusts, which conceal the identity of the beneficiary from everyone but the bank's trust department, and fictitious nominees, who would purchase various parcels of real estate from Union Oil and then "turn around" and sell to a third party at a substantial profit to Link. This was done without Union Oil's knowledge. The proceeds of the second sale were then delivered to Link who would pay defendant in cash for his services.

Upon Link's request defendant allegedly supplied the fictitious nominees for the deals. Defendant and Link would then cause the fictitious nominees to offer to purchase the property and give Union Oil a $500 or $1000 cashier's check as earnest money. The earnest money receipt set forth the basic terms and conditions of the sale. Reagan or his associate personally represented the fictitious nominees at the closing of the turnaround sale.

However, the signatures of the fictitious nominees or their representatives which appeared on the real estate deeds and closing statements were not genuine. Either defendant or one of his secretaries, acting at his direction, notarized the fictitious signatures.

Defendant represented Link in several real estate transactions, but the nature and extent of defendant's participation in the fraud scheme was disputed. Link testified that defendant provided the nominees and arranged for land trusts on his own initiative. Defendant testified that he provided nominees only upon Link's request and established land trusts pursuant to Link's specific directions. According to defendant, he believed that Union Oil knowingly permitted Link to make a personal profit from the transactions and that he was "just closing real estate transactions" for a client. Link was the Government's principal witness in establishing defendant's knowledge and intent.

## II

Link entered into a plea agreement under which he promised to cooperate by testifying against defendant. Link pleaded guilty to two counts of fraud, receiving a sentence of nine months on one count and five years probation on the other. Although he began his nine month term on June 1, 1979, in September 1979 Link filed a motion with the sentencing court to modify his sentence to allow him to return home immediately because there was "substantial reason to believe that Mrs. Link's mental health has severely degenerated." The Government informed the court that it was "not going to take a position in this matter." The court granted the motion and ordered on September 10, 1979 that Link be immediately released.

At defendant's trial, Link testified about his plea agreement, and the agreement was admitted into evidence. As to his sentence, Link stated on direct examination that he had been sentenced to nine months, but did not mention his early release:

Q. As a result of pleading guilty to two counts of mail fraud, were you sentenced to jail and did you serve time in a federal penitentiary?

A. Yes, I did.

Q. What was your sentence?

A. Nine months.

The court further questioned Link about his sentence:

THE COURT: What were the two sentences you received?

THE WITNESS: I received nine months' incarceration on one and five years' probation on the other.

THE COURT: That was consecutive to the nine months?

THE WITNESS: No. As I understand it, the five years was to begin after I spent my term in the federal institution.

THE COURT: After the nine months?

THE WITNESS: Yes.

THE COURT: When did you finish the nine months?

THE WITNESS: The middle of September, 1980.[1]

In closing argument, the Government slightly mischaracterized that testimony: "Mr. Link testified in this case and told you that ... he was *in jail* for a period of nine months...." (Emphasis added).

In a motion for a new trial based on newly discovered evidence, defendant contended that the Government violated *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), by failing to disclose the reduction of Link's sentence and by using the allegedly false testimony of Link concerning his incarceration. Defendant appeals from the denial of that motion.

In *Giglio,* the Court held that the defendant was entitled to a new trial because the Government failed to disclose a plea agreement with its principal witness, the witness on cross-examination falsely stated that he received no promise of leniency in exchange for his testimony, and the Government in closing argument stated that the witness received no promises. The Court relied on *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), which imposed a duty on the Government to correct evidence which it knows to be false, and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1959), wherein the Court ruled that the Government must disclose to the defense evidence in its possession that is favorable to the defendant. 405 U.S. at 153, 92 S.Ct. at 765. The Court, however, made clear that *Napue* and *Brady* are not without qualification:

> We do not, however, automatically require a new trial whenever "a combing of the prosecutors' file after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict...." A finding of materiality of the evidence is required under *Brady.* A new trial is required if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury...."

*Id.* at 154, 92 S.Ct. at 766 (citations omitted). But in *Giglio* the court found that the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to future prosecution would be relevant to his credibility and the jury was entitled to know of it. *Id.* at 154–55, 92 S.Ct. at 766.

Here, there is no question that Link's testimony was crucial to the Government's case against defendant. But that fact alone does not make the sentence reduction material. Unlike in *Giglio* and *Napue,* the basic plea agreement between Link and the Government was disclosed to the defense and placed before the jury. Defendant's attorney had ample opportunity to cross-examine Link thoroughly on the agreement and, indeed, took advantage of that opportunity by questioning Link as to his understanding of it. Link admitted that he entered into the agreement for his personal benefit. The extent of Link's cooperation with the Government was well established at trial. Defendant furthermore presented no evidence that the early release was an unwritten term of the plea agreement or that the Government's decision not to take a position on Link's release was understood to be additional consideration for his cooperation. Given Link's family problems, his early release and the lack of opposition thereto was certainly understandable and not suspiciously unusual. Moreover, the fact that Link served three and one-half months instead of nine months likely would not have altered the jury's assessment of Link's credibility as a witness. The jury was already aware that Link received a relatively light sentence in exchange for this testimony. In addition, cross-examination disclosed that, as part of a settlement with Union Oil, Link had agreed to cooperate with Union Oil in proceeding against defendant, that Link had lied on his federal income tax returns by

---

1. Link actually was released in September 1979.

failing to declare income received from the turnaround transactions, and that he had lied to Union Oil for ten years concerning the secret profits.

Link, on direct, was asked what sentence had been imposed. His response of nine months was technically correct, although it could possibly be misleading since he did not serve that full period contrary to a comment by the Government in argument. We find that the inaccuracies present in this case do not rise to the level of constitutional deprivations.

### III

Defendant contends that the Government, in closing argument, improperly commented on the possible sentence defendant might receive and made an unsupported accusation that the defendant had also committed tax evasion. Defendant raised these arguments in a new trial motion which the district court denied.

In considering the propriety of a prosecutor's closing statement, the Supreme Court in *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), recognized that not every trial error or infirmity constitutes "failure to observe that fundamental fairness essential to the very concept of justice." *Id.* at 642, 94 S.Ct. at 1871, *citing Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941). The Court stated in part:

> Such arguments, like all closing arguments of counsel, are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have the most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*Id.* at 645–47, 94 S.Ct. at 1872–73. This court in *United States v. Castenada,* 555 F.2d 605 (7th Cir.), *cert. denied,* 434 U.S.

847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977), followed *Donnelly:*

> Viewing the record and trial *in their totality,* we cannot conclude that these irregularities had any likelihood of changing the result of the trial. The remarks do not approach the level of constitutional magnitude. The Supreme Court has emphasized the difference between the "ordinary trial error of a prosecutor" and "egregious conduct" amounting to a denial of due process.

555 F.2d at 610 (emphasis added).

A United States Attorney, moreover, "may prosecute with earnestness and vigor," *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), and may comment upon his opponent's arguments. *United States v. Isaacs,* 493 F.2d 1124, 1165 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). It is beyond question that invited response is a proper subject of a closing argument. *Id.* at 1165. *See also United States v. Falk,* 605 F.2d 1005, 1013 (7th Cir.1979), *cert. denied,* 445 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980).

During closing argument, the Government stated:

> Now, when you think of Link's reasons for telling the truth, contrast them with [defendant's] motives to white wash his involvement, to testify that Link lied. He has got every reason in the world. He told the psychologist, "My biggest fear is going to jail." So, when he testified here, he would testify that Link lied.... *He'll say anything he can not to go to jail for two or three months.* (Emphasis added).

Defendant's attorney objected, and the court immediately instructed the jury to disregard the prosecutor's statements relating to defendant's possible punishment stating, "The question of punishment is entirely up to the Court. The jury will have no concern with that whatsoever." In the charge to the jury, the court reiterated its admonition:

In determining the guilt or innocence of the defendant the jury should not give any consideration to the matter of punishment, for this question is exclusively the responsibility of the Judge. In that respect, I instruct you to disregard any statement that may have been made by any party, and specifically the prosecutor, with respect to punishment of the defendant.

■ "The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial. Breach of this standard has often been grounds for reversal." *United States v. Greer,* 620 F.2d 1383, 1384 (10th Cir.1980). However, it is generally presumed that erroneous admission of evidence is cured by instructing the jury to disregard it, unless the impression created is so strong as to have prejudiced the defendant. *United States v. Jiminez-Badilla,* 434 F.2d 170 (9th Cir.1970).

■ We agree that the Government's remark, when viewed in isolation, was outside the bounds of proper comment. We see no reason to believe that the remark was intended as a comment on defendant's possible sentence, but resulted only from trial counsel's carelessness in impeaching defendant's testimony. When viewed in its entire context, as required under *Donnelly* and *Castenada,* that comment cannot be said to have prejudiced defendant. The Government was attempting to explain defendant's strong motive to lie, which clearly is a subject for fair comment. There is no evidence that the reference to "two or three months" in jail was emphasized or conveyed in a manner that suggested the jury could render a compromise verdict, if necessary, since defendant would receive a light sentence anyway. In fact, the context shows just the opposite—that defendant would view even a light sentence as devastating. We conclude that the court's instructions adequately erased any improper impact the comment may have had on the jury.

The second comment that defendant claims necessitates a new trial was made in rebuttal in reference to defendant's motive to participate in Link's scheme:

Now, how much did he ask for? $750 to $1,000? Ladies and gentlemen, maybe that doesn't seem like a lot of money. I think it is. But I think it is an awful lot of money for two hours of work and in some cases ten minutes of secretarial work. I think that Richard Link was a very good cash customer. I think that is why [defendant] went along with this.... That is a pretty good motive to participate in it.

He says $750. *So, there is a very strong possibility of $250 to $500 tax free on those transactions....* (Emphasis added).

Defendant made no objection and did not request a curative instruction. Thus, our review is limited to whether the remark was so prejudicial as to amount to plain error. Fed.R.Crim.P. 52; *see United States v. West,* 670 F.2d 675, 688 (7th Cir.1982).

■ It is improper for the prosecution to make an unsupported statement that defendant has engaged in other criminal activity. *United States v. Labarbera,* 581 F.2d 107 (5th Cir.1978). "The fundamental rule, known to every lawyer," is "that argument is limited to the facts in evidence." *United States v. Fearns,* 501 F.2d 486, 489 (7th Cir.1974). But it is equally well settled law where the defense counsel makes remarks in closing that invite the Government to respond, the prosecutor may, in rebuttal, enter into areas which would otherwise constitute improper argument. *United States v. Hedman,* 630 F.2d 1184 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981).

■ At trial, the amount of cash defendant received from Link on the transactions was in sharp dispute. Defendant's testimony conflicted with Link's on this point, and trial counsel for defendant relied on defendant's ledger sheets and cash receipts to show an amount lower than what Link said he gave defendant. In closing argument, defense counsel repeatedly stated that the amount of money defendant received was so small that it did not provide a motive to engage in an illegal scheme:

Let's just take a brief overview of the case. Okay? What possible reason—ask yourself—was there for [defendant] to aid Link in cheating the employer? Could his motive have been money? I don't think so. You look at his fees on the transactions that relate to the indictment. And when you folks go back in the jury room you will see his ledger which ... clearly shows every one of these transactions as being handled by Mr. Link. So, he wasn't trying to hide it in his office. *He wasn't trying to hide it from the IRS. It is reported on his income.* The motive wasn't money because on the indictment transactions the fees to [defendant] were something like $3,200 and Link got something like a $52,000 profit. (Emphasis added).

The Government asserts that its remark about "tax free" income was a fair response.

We believe that the comment in rebuttal was "reasonably deducible from the evidence of record," *United States v. Vargas,* 583 F.2d 380, 385 (7th Cir.1978), and constituted a fair response to defense counsel's closing statement. Defendant argues that "[t]here was simply no evidence that the defendant had not reported all of the receipts on his income tax returns." That argument misses the point. Defense counsel took the position that the receipts, and thus defendant's reported income, accurately reflected the money received. The record, however, contains sufficient evidence from which a jury could reasonably infer that defendant's receipts understated the cash received from Link. It was therefore proper for the Government to rebut that inference in closing.

### IV

For the foregoing reasons, we affirm the decisions of the district court.

AFFIRMED.