**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Samuel M. CHAIMSON,
Defendant-Appellant.**

**No. 84–1086.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 2, 1984.

Decided April 24, 1985.

As Amended April 24, 1985.

Cudahy, Circuit Judge, filed concurring opinion.

Andrea L. Davis, Asst. U.S. Atty. (Dan K. Webb-U.S.A.), Chicago, Ill., for plaintiff-appellee.

John Powers Crowley, Cotsirilos & Growley, Ltd., Chicago, Ill., for defendant-appellant.

Before CUDAHY, POSNER and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

The defendant-appellant, Samuel Chaimson, appeals his conviction for fifteen counts of mail fraud in violation of 18 U.S.C. § 1341 and one count of racketeering in violation of 18 U.S.C. § 1962(c). We affirm.

I

This case involves a scheme among employees at the Cook County Board of Appeals, Chicago area attorneys, and Chicago area tax consultants to fraudulently reduce real estate assessments in Cook County, Illinois. The record reveals that Cook County, encompassing the city of Chicago, Illinois, contains approximately 1,300,000 parcels of real estate. The Cook County Assessor's Office divides the county into four regions and assesses the property in

each region on a quadrennial basis. The assessment is used as a base figure in calculating the real estate tax due and owing on each parcel of land within the county.[1]  In the event the property owner disputes the assessment, he may file an informal complaint with the Cook County Assessor's Office.  If the complaint is denied, the property owner may then file a claim with the Cook County Board of Appeals on his own behalf or through an attorney.[2]  According to this procedure, the property owner, or his attorney, submits a formal complaint to the Board of Appeals, the complaint is assigned a file number, and all relevant documentation in support of the claim is placed in a complaint file folder.  A hearing examiner initially inspects the file, ensures that the supporting data is complete, and then forwards the file to one of the two elected commissioners on the Board of Appeals.  The first commissioner reviews the file and, if he denies the claim, marks the file "no change," dismissing the case.  In contrast, if the first commissioner agrees with the property owner's claim, he authorizes the change in the property valuation, initials the file, and sends it to the Board of Appeals' data processing room for the computation of a new assessment.  The commissioner then approves the new valuation, affixes his initials to the file, and forwards the file to the second commissioner.  Pursuant to Illinois statute, each commissioner must approve a change in the property valuation before such change is entered in the official county records. *See* Ill.Rev.Stat. ch. 120, § 599 (1983).  Thus, if the second commissioner denies the claim, the case is dismissed.  If, however, the second commissioner approves the lower assessment, he initials the file and forwards it to the Cook County Assessor's

Office for entry of the reduced assessment in the official county records.

During the relevant time period in this case, July 1976 thru September 1979, the elected commissioners on the Cook County Board of Appeals were Seymour Zaban and Harry Semrow.  Due to the dramatic increase in the number of cases submitted to the Board during this period, the commissioners agreed to authorize their deputy commissioners to review files and approve or deny the property owners' claims.[3]  The deputy commissioners involved in the instant case include Thomas Lavin and Robert Hosty, who were employed by commissioner Semrow, and Donald Erskine, who was employed by commissioner Zaban.  These three deputy commissioners, along with the Board of Appeals' computer operator David Woodlock and a number of hearing examiners, comprised the "inner core" of the fraudulent assessment reduction scheme at the Cook County Board of Appeals.  The scheme consisted of Chicago area attorneys and tax consultants paying off these Board employees to unlawfully approve reductions in real estate assessments.  The payoffs included hard currency, household furniture, and even suites of bedroom furniture.  In turn, the attorneys and tax consultants charged their clients a percentage of the assessment reduction as a fee.

The operation of the scheme was relatively simple; certain Chicago area lawyers and tax consultants would supply Erskine, Lavin, or Hosty with a list containing the name and file number of those cases that were to receive a fraudulent assessment reduction.  Erskine would retrieve the file, place a suggested assessment reduction in

1.  In Cook County, the real estate assessment is computed as a percentage of the fair market value of the property, adjusted according to the residential or commercial use of the property.

2.  The record reveals that individual homeowners contesting the assessment of their residential property may appear before the Cook County Board of Appeals on their own behalf, but owners of commercial property must appear before the Board through an attorney.

3.  The Cook County Board of Appeals hears complaints from September through June of the following year.  The record reveals that during the 1972–73 Board session, the commissioners considered some 13,000 appeals but by the 1981–82 Board session, the commissioners were presented with some 41,000 appeals.

the file folder without ever reviewing the merits of the claim, and forward the file to Lavin who would write the reduction in the appropriate box on the file folder and forge commissioner Semrow's signature of approval. Laving would then send the file to computer operator Woodlock who would calculate the new assessment and return the file to Lavin. Upon receipt of the file, Lavin would direct commissioner Semrow's secretary to affix the commissioner's signature to the file. Pursuant to normal Board procedure, the file would then be routed to commissioner Zaban's office where Erskine would direct Zaban's secretary to affix Zaban's signature of approval on the file. Finally, the file would be transferred to the Cook County Assessor's Office and the new assessment would be entered in the official county records. During this process, commissioners Zaban and Semrow would never have an opportunity to personally see the file much less review the merits of the property owner's claim.

The fraudulent assessment reduction scheme continued uninterrupted until January 1978, when Lavin resigned from the Board of Appeals due to accusations that he illegally participated in fraudulent assessment reductions while employed for commissioner Semrow. Lavin was the only Board employee adept at forging commissioner Semrow's signature, thus following Lavin's departure from the Board, the members of the scheme were forced to transport files to Lavin outside the office in order to obtain precise forgeries of Semrow's signature. This new procedure continued until November 1978, when Erskine resigned from the Board following public allegations of misconduct. Some ten months later, in August 1979, the Board discovered that computer operator Woodlock had reduced an assessment without the authorization of either of the commissioners. Soon thereafter, an extensive state and Federal investigation of the Cook County Board of Appeals uncovered the fraudulent scheme. According to a report compiled by the Federal Bureau of Investigation ("FBI"), Lavin received an estimated $250,000, Erskine received an estimated $150,000, and Woodlock received and estimated $67,000 in bribes for their participation in fraudulent real estate assessment reductions. All three Board employees were indicted by a Federal Grand Jury on numerous counts of racketeering, mail fraud, perjury, and filing of fraudulent income tax returns. All three individuals pled guilty to a limited number of the offenses charged, obtained qualified immunity from the Government, and agreed to cooperate with the Government in obtaining additional incriminating evidence against the Chicago area attorneys and tax consultants involved in the scheme. As a part of this "sting" operation, Erskine participated in wire-tapped conversations, both in person and over the telephone, with various Chicago attorneys, including the defendant, Samuel Chaimson. On May 5, 1983, a Federal Grand Jury returned an indictment against Chaimson for fifteen counts of mail fraud in violation of 18 U.S.C. § 1341 and one ount of racketeering in violation of 18 U.S.C. § 1962(c). Chaimson pled not guilty to the crimes charged.

At trial, the Government established that Chaimson hired Peter Alexander in November 1971 to work as an associate at his law firm of Welfeld & Chaimson. The firm, managed by the defendant and specializing in state, municipal, and real estate tax law, frequently appeared before the Board of Appeals contesting real estate assessments. Chaimson trained Alexander to represent the firm's clients before the Board and thereby replace Phillip Fleischman, the attorney previously responsible for such work who had recently left the firm. As part of this training, Chaimson introduced Alexander to Donald Erskine, the deputy commissioner to commissioner Zaban and a linchpin in the assessment reduction scheme. Alexander and Erskine soon developed a close personal relationship, attending social functions together, meeting daily for breakfast at a downtown Chicago restaurant, and even pooling their funds to purchase four condominium units on the near north side of Chicago. In July 1976, Erskine met with Alexander and the

defendant, Samuel Chaimson, in Chaimson's office to discuss the status of the Welfeld & Chaimson files then pending before the Board. According to the testimony of Erskine and Alexander, at the close of this meeting Chaimson thanked Erskine for his assistance and personally handed him a plain, white, letter-size envelope containing $300–$400 in cash. During the following Board session, from September 1976 thru June 1977, Alexander accompanied Erskine to Chaimson's office three or four more times and at the close each meeting, Chaimson personally handed Erskine a plain, white, letter-size envelope containing cash. The record reveals that during this 1976–77 Board session, Erskine received approximately $800 in cash from Chaimson and, in return, 97% of the Welfeld & Chaimson cases pending before the Board received fraudulently approved real estate assessment reductions. Similarly, during the Board session from September 1977 thru June 1978, Chaimson personally handed Erskine plain, white, letter-size envelopes five or six more times, containing payoffs in excess of $1,700. As a result, 94% of Welfeld & Chaimson's real estate assessment reduction claims filed during the 1977–78 Board session were fraudulently granted.

The Government further established that in June 1977, Chaimson handed a plain, white, letter-size envelope, containing $150 in cash, to Alexander with instructions to deliver the envelope to David Woodlock, the Board of Appeals' computer operator. The record reveals that during the 1977–78 Board session, Woodlock received $700 from Alexander in plain, white, letter-size envelopes supplied by Chaimson and that during the 1978–79 Board session, Woodlock received another $800 from Alexander and the defendant's son, Fred Chaimson, in similar fashion.[4] In sum, the Government's evidence established that between

the years 1976 and 1979, the law firm of Welfeld & Chaimson had some 295 cases fraudulently approved at the Board of Appeals, yielding total reductions of $10,146,463 and legal fees in the amount of $294,030.89.[5]

Following the close of the Government's case-in-chief, Chaimson took the stand and denied any knowledge of the fraud scheme at the Board of Appeals, denied any participation in the scheme, and denied paying any bribes directly to Erskine or authorizing any bribe payments to Woodlock in plain, white, letter-size envelopes. On cross-examination, when Chaimson continued to deny any knowledge of the scheme, the Government informed the court, out of the presence of the jury, that it was going to inquire about previous bribe payments that Chaimson had made to the Chief Deputy Assessor of Cook County. The Government advised the court that Alexander was prepared to testify on rebuttal that Chaimson had told him "[t]his isn't like the old days, when we used to pay money to Russ Johnson over at the Assessor's Office." The Government also informed the court that Marshall Fleischman, a former attorney at Welfeld & Chaimson, was prepared to testify on rebuttal that Chaimson asked him to deliver a plain, white, letter-size envelope, described as dark in the center and light around the edges as if containing money, to Russ Johnson, the Chief Deputy Assessor of Cook County. Chaimson's defense counsel objected to the subject matter of the Government's proposed questions and rebuttal evidence on the ground that the testimony was not clear and convincing evidence of an improper act and therefore was inadmissible under Fed.R. Evid. 404(b). The court overruled the objection and permitted the Government to cross-examine Chaimson as follows, "do you recall an incident in 1971 where you sent Mr. Fleischman over to the Assessor's

---

4. The defendant's son, Fred Chaimson, was also a member of the Welfeld & Chaimson law firm who frequently appeared before the Cook County Board of Appeals contesting real estate assessments.

5. According to the Government's evidence, Chaimson's percentage of the $294,030.89 in legal fees received by Welfeld & Chaimson between the years 1976 and 1979 for fraudulent real estate reductions amounted to $89,310.98.

office with a plain white envelope to give to Russ Johnson?" Chaimson responded, "It's a possibility. But it's 1971, this is 1983, 12 years. I don't remember." The Government then asked Chaimson if recently, between 1976 and 1980, "[y]ou had a conversation with Mr. Alexander in your law firm and during that conversation you made reference to the fact that in the past you had paid Russ Johnson in connection with cases at the Assessor's office." Chaimson replied "Absolutely not."

On rebuttal, the Government introduced evidence to show that Chaimson did, in fact, make monthly cash bribe payments to the Chief Deputy Assessor of Cook County. Alexander testified that sometime after July 1976 but before 1980, Chaimson told him that "when Mr. Johnson was the Chief Deputy Assessor, he [Chaimson] had been making payments to Mr. Johnson on a regular monthly basis." In addition, Marshall Fleischman testified that in January 1971, Chaimson asked him to deliver a "small white sealed envelope" to Russ Johnson, the then Chief Deputy Assessor of Cook County. According to Fleischman, when he examined the letter-size envelope before a light, he observed that it contained "something dark ... [and] around the edges it was light." Based upon the totality of the evidence presented, the jury returned a verdict of guilty against Chaimson on all fifteen counts of mail fraud in violation of 18 U.S.C. § 1341 and the one count of racketeering in violation of 18 U.S.C. § 1962(c). On January 12, 1984, the district court judge sentenced Chaimson to sixteen concurrent year-and-one-day prison terms, fined him $1,000 for each mail fraud count, and $25,000 for the racketeering count. On appeal, Chaimson contends that the trial court committed reversible error by admitting evidence of the previous cash payments to the Chief Deputy Assessor of Cook County. Chaimson further claims that the prosecutor's alleged misconduct deprived him of a fair trial.

## II

### A. "OTHER ACTS" EVIDENCE

■ The initial issue before this court is whether the Government's rebuttal evi-

dence of previous cash bribe payments to the Chief Deputy Assessor of Cook County satisfies the standards of Fed.R.Evid. 404(b) which provides:

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

According to Rule 404(b), evidence of other acts cannot be introduced to establish the defendant's bad character or to show his propensity to commit the act in question simply because he committed a similar act in the past. Instead, evidence of extrinsic conduct may be introduced only to prove the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In this circuit, evidence of other acts is admissible if:

> "(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue ..., (3) the evidence is clear and convincing, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."

*United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir.1984) (citation omitted). *See also United States v. Stump,* 735 F.2d 273, 275 (7th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 203, 83 L.Ed.2d 134 (1984); *United States v. Kane,* 726 F.2d 344, 348 (7th Cir.1984); *United States v. Wormick,* 709 F.2d 454, 459 (7th Cir.1983).

Chaimson claims that the Government's rebuttal evidence concerning previous bribe payments to the Chief Deputy Assessor of Cook County was introduced for the sole and improper purpose of demonstrating his

propensity to commit the crime charged. Chaimson does acknowledge that mail fraud is a specific intent crime and that evidence of previous bribe payments is relevant to the issue of intent.[6] Nevertheless, Chaimson asserts that in the present case intent was never an issue because his defense, at trial, was that he had absolutely no knowledge of the fraudulent reduction scheme involving his office and the Cook County Board of Appeals. According to Chaimson's flawed reasoning, as long as he claimed no knowledge of the fraud scheme—and not that he knew of the scheme but lacked the requisite intent for mail fraud—the Government was precluded from introducing "other acts" evidence on the issue of intent. To support his argument, Chaimson relies upon a line of Second Circuit cases holding that even when intent is an element of the offense, if the defendant claims as a defense that he had no involvement at all in the crime charged, then intent is "not really in dispute" and the Government is precluded from introducing "other acts" evidence to prove intent. *See United States v. Manafzadeh*, 592 F.2d 81, 87 (2d Cir.1979) (*"Manafzadeh"*); *United States v. O'Connor*, 580 F.2d 38, 41 (2d Cir.1978); *United States v. Benedetto*, 571 F.2d 1246, 1249 (2d Cir. 1978).

For example, in *Manafzadeh*, the defendant was charged with two counts of unlawfully transporting, in interstate commerce, fraudulent checks in violation of 18 U.S.C. § 2314.[7] As a defense to this specific intent crime, the defendant claimed that "he had never been involved in the creation or negotiation of these fraudulent checks at all." *Manafzadeh*, 592 F.2d at 85. In its case-in-chief, the Government introduced evidence that four months after the crime in question, the defendant attempted a similar scheme of depositing fraudulent checks into a bank account and then withdrawing cash from that same account. The defendant objected to the introduction of this "other acts" evidence, "arguing that this was irrelevant to the only issue in the case, which was whether he had participated in the creation or deposit of the forged checks" in question. *Id.* The defendant offered to stipulate that if the jury found that he participated in the creation of forged checks, he would concede the issue of intent.[8] In view of this defense, the Second Circuit ruled that the Government's "other acts" evidence was inadmissible to prove intent because "intent was not in dispute" and the only issue before the jury was whether the defendant "had anything to do with the creation or deposit of the six fraudulent checks alleged in the indictment...." *Id.* at 87.

This court has previously rejected the Second Circuit's reasoning in *Manafzadeh* because, in effect, it allows a defendant to remove intent as an element of the crime charged. We have repeatedly held that in cases where the Government must prove specific intent as an element of the crime charged, evidence of other acts may be introduced to establish that intent. *See United States v. Shackleford*, 738 F.2d at

6. Title 18 U.S.C. § 1341 (1982) provides, in pertinent part:
"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined not more than $1,000 or imprisoned not more than five years, or both."

7. Title 18 U.S.C. § 2314 (1982) provides, in pertinent part:
"Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both."

8. In subsequent interpretations of *Manafzadeh*, the Second Circuit has placed significant emphasis upon the defendant's willingness to stipulate that if the jury found he participated in the crime charged, he would concede the issue of intent. *See United States v. Mohel*, 604 F.2d 748, 752–54 (2d Cir.1979); *United States v. Danzey*, 594 F.2d 905, 912 n. 5 (2d Cir.), *cert. denied*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979).

781; *United States v. Kovic,* 684 F.2d 512, 515 (7th Cir.), *cert. denied,* 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 284 (1982); *United States v. Price,* 617 F.2d 455, 459–60 (7th Cir.1979); *United States v. Weidman,* 572 F.2d 1199, 1202 (7th Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978) (*"Weidman"*). Indeed in *Weidman,* the defendant, just as Chaimson in the present case, was charged with mail fraud arising out of his participation in a bribe scheme. The Government introduced evidence, in its case-in-chief, that on an earlier occasion the defendant had participated in a similar bribe scheme. The defendant asserted that "his defense was based not on a claim of 'accident' or 'mistake' but on the broad denial that he had committed the charged acts," thus intent was merely a "formal issue" and the Government's "other acts" evidence was inadmissible. *Weidman,* 572 F.2d at 1202. This court held that the evidence of other acts was properly admitted under Fed.R.Evid. 404(b) to prove intent, since specific intent is a required element of mail fraud and the Government must prove each and every element of the crime charged beyond a reasonable doubt. We concluded that "quite apart from the nature of Weidman's defense there was, on the issue of intent, a substantial need for the government's evidence on prior similar acts." *Id.* Similarly, in the present case, Chaimson was charged with mail fraud and the Government was required to prove the element of specific intent beyond a reasonable doubt. In accord with this court's sound legal reasoning in *Weidman,* the Government was permitted to introduce evidence of Chaimson's previous cash bribe payments to the Chief Deputy Assessor of Cook County for purposes of establishing intent.

We note that in *Weidman,* the Government introduced the "other acts" evidence in its case-in-chief to prove the intent element of mail fraud. In the present case, the Government initially inquired about previous bribe payments to the Cook County Assessor in its cross-examination of Chaimson and withheld the presentation of evidence on the issue until its rebuttal case.

Chaimson argues that the Government's failure to introduce the "other acts" evidence in its case-in-chief, coupled with the fact that the defense never challenged the intent element, precludes the Government from introducing such evidence in its rebuttal case. We disagree. The Government, in its case-in-chief, introduced evidence establishing that Chaimson paid bribe money directly to Erskine and authorized the payment of bribe money to Woodlock in order to obtain fraudulent reductions in Cook County real estate assessments. The Government's case-in-chief evidence further revealed that Chaimson paid this bribe money with the expectation that his clients would receive fraudulent real estate assessment reductions. Thus, the Government introduced more than sufficient evidence in its case-in-chief to prove that Chaimson acted with the requisite intent to defraud, beyond a reasonable doubt. In defense, Chaimson took the stand and denied any knowledge of the fraud scheme and furthermore denied ever making any bribe payments to employees at the Board of Appeals. The intended effect of Chaimson's absolute and unequivocal denial was to negate completely the Government's proof, including the proof that Chaimson acted with intent to defraud. In view of Chaimson's blanket denial of any wrongdoing, and the fact that such a denial was meant to nullify any evidence of intent, it was certainly proper for the Government to overcome the defendant's absolute denial and reestablish the element of intent, in its rebuttal case, with the introduction of evidence concerning the earlier bribe payments. Accordingly, we hold that the evidence of previous cash bribe payments to the Chief Deputy Assessor of Cook County "is directed toward establishing" intent and thus satisfies the first prong of the Rule 404(b) test in this circuit.

■ The next inquiry is whether the previous bribe payments to the Cook County Assessor are sufficiently similar and related in time to the bribe payments in question to be admitted as evidence on the issue of intent. The Government, in its case-in-

chief, established that Chaimson personally handed Erskine bribe money in plain, white, letter-size envelopes from July 1976 thru November 1978. In addition, between June 1977 and August 1979, Chaimson gave plain, white, letter-size envelopes to Alexander and his son, Fred Chaimson, with instructions to deliver the bribe payments contained therein to computer operator Woodlock. On rebuttal, Alexander testified that sometime after 1976, Chaimson informed him that, "when Mr. Johnson was the Chief Deputy Assessor, he [Chaimson] had been making payments to Mr. Johnson on a regular monthly basis." The Government also presented testimony from Marshall Fleischman that in January 1971, Chaimson asked him to deliver a "small white sealed envelope" to Russ Johnson, the then Chief Deputy Assessor of Cook County. According to Fleischman, the envelope, when held up to the light, contained "something dark ... [and] around the edges it was light." This "other acts" evidence, introduced in the Government's rebuttal case, reveals Chaimson's planned participation in a bribe payment scheme with the Chief Deputy Assessor of Cook County that was substantially similar to Chaimson's planned payment of bribe money to employees at the Cook County Board of Appeals. Indeed, the bribe payments to the Cook County Assessor, as well as the bribe payments to employees at the Board of Appeals, were made by Chaimson, either directly or indirectly through intermediaries, in plain, white, letter-size envelopes to persons associated with the Cook County assessment system to obtain fraudulent reductions in real estate assessments. We add that Chaimson's law practice throughout the decade of the 1970's consisted of continual appearances before the Cook County Assessor's Office and the Board of Appeals to challenge real estate assessments on behalf of individuals as well as corporate clients. There can be no doubt that in view of Chaimson's continual and ongoing association with the Cook County assessment system, the Government's rebuttal evidence—including Chaimson's admission to Alexander, sometime after 1976, that he made bribe payments to the Cook County Assessor and Fleischman's delivery of such a bribe payment in January 1971— is sufficiently related in time to the bribe payments in the present case, occurring from July 1976 thru August 1979, to satisfy the closeness in time requirement of Rule 404(b). *See, e.g., United States v. Radseck,* 718 F.2d 233, 236–37 (7th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984) (five years); *United States v. Zeidman,* 540 F.2d 314, 319 (7th Cir.1976) (five years). Thus, we hold that the Government's evidence of previous cash bribe payments to the Cook County Assessor is "similar enough and close enough in time" to satisfy the second prong of the Rule 404(b) test in this circuit.

■ We turn next to the issue of whether the Government's evidence introduced on the issue of previous bribe payments is clear and convincing. Chaimson argues that the Government failed to prove, by clear and convincing evidence, that the earlier bribe payments were, in fact, a crime. Chaimson misinterprets the clear and convincing standard, for as we reasoned in *United States v. Dolliole,* 597 F.2d 102 (7th Cir.), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318 (1979):

> "the clear and convincing standard is ... designed principally to prevent the jury from exposure to or consideration of evidence that establishes the defendant's participation in the prior crime only by highly circumstantial inferences. Direct testimony of the defendant's participation in a prior crime ... is ordinarily held to satisfy the clear and convincing standard."

597 F.2d at 107. *See also United States v. Hyman,* 741 F.2d 906, 913 (7th Cir.1984); *United States v. Berkwitt,* 619 F.2d 649, 655 (7th Cir.1980); *United States v. O'Brien,* 618 F.2d 1234, 1239 (7th Cir.), *cert. denied,* 449 U.S. 858, 101 S.Ct. 157, 66 L.Ed.2d 73 (1980). In the present case, the Government established Chaimson's participation in the bribe payment plan with the Cook County Assessor through the direct testimony of Alexander and Fleischman.

Alexander was party to a conversation in which Chaimson admitted making cash bribe payments to the Cook County Assessor and Fleischman acted as an intermediary in delivering one of Chaimson's cash bribe payments to the Assessor. The Government did not present the jury with circumstantial evidence nor did it require the jury to draw circumstantial inferences in order to conclude that Chaimson paid cash bribes to the Chief Deputy Assessor of Cook County. Chaimson's claim that there was no direct testimony that the small, white, sealed envelope that Chaimson handed to Fleischman in January 1971 actually contained a bribe payment is without merit. Fleischman testified that the letter-size envelope contained "something dark ... [and] around the edges it was light." In view of Alexander's previous testimony that Chaimson admitted to making bribe payments to the Cook County Assessor, it was certainly reasonable for the jury to conclude that the letter-size envelope contained a cash bribe payment. Moreover, Chaimson's defense counsel had ample opportunity on cross-examination to impeach the testimony of both Alexander and Fleischman. Accordingly, we hold that the Government's evidence on the issue of previous cash bribe payments to the Chief Deputy Assessor of Cook County was clear and convincing, thus satisfying the third prong of the Rule 404(b) test in this circuit.

■ We turn next to the issue of whether the probative value of the previous bribe payments was substantially outweighed by the danger of unfair prejudice to the defendant. It is well-settled that "[t]he trial judge, who saw and heard the evidence firsthand, can best balance probity and prejudice, and the reviewing court may reverse only upon a showing of abuse of discretion." *United States v. Brown,* 688 F.2d 1112, 1117 (7th Cir.1982) (citing *United States v. Watson,* 623 F.2d 1198, 1203 (7th Cir.1980)). *See also United States v. Levy,* 741 F.2d 915, 924 (7th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984); *United States v. Jordan,* 722 F.2d 353, 357 (7th Cir.1983); *Weidman,* 572 F.2d at 1201–02. In view of

Chaimson's absolute and unequivocal denial of any participation in or knowledge of the fraudulent reduction scheme, and his attempt to negate the Government's proof on the issue of intent, it was certainly proper for the Government to reestablish, in its rebuttal case, the requisite intent to defraud. Chaimson has failed to present this court with any evidence that the clear probative value of the Government's "other acts" evidence was outweighed by any prejudice to his defense. Indeed, in this circuit we do not allow a criminal defendant, charged with a crime requiring a showing of specific intent, to remove intent as an element of the Government's proof by merely raising as a defense that he did not participate in the crime charged. Accordingly, we agree with the district court that under the standards of Fed.R.Evid. 403, the probative value of the Government's "other acts" evidence is not outweighed by the prejudicial effect to the defendant.

■ We add that the evidence of previous cash bribe payments to the Cook County Assessor is admissible not only on the issue of intent but also on the issue of a pre-existing scheme, design, or plan. The evidence reveals that Chaimson's *modus operandi* was to make cash bribe payments, either directly or indirectly through intermediaries, in plain, white, letter-size envelopes to obtain unauthorized, fraudulent reductions in the real estate assessments of Welfeld & Chaimson clients. To satisfy the similarity requirement of a pre-existing plan, the Government must show that such evidence bears "a singular strong resemblance to the pattern of the offense charged." *United States v. Shackleford,* 738 F.2d at 783 (quoting *United States v. Jones,* 438 F.2d 461, 466 (7th Cir.1971)); *Weidman,* 572 F.2d at 1202. The Government introduced ample evidence to establish that Chaimson made cash bribe payments to Board of Appeals' employees in plain, white, letter-size envelopes for the purpose of obtaining fraudulent assessment reductions. Chaimson's method of paying bribes in the plain, white, letter-size envelopes was not only distinct but "suffi-

ciently idiosyncratic to permit an inference of pattern for purposes of proof." 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[16], at 404–94 (1982). The Government's evidence revealed that employees at the Board of Appeals accepted bribes in forms ranging from household furniture and complete bedroom suites to hard currency. Given the distinctive feature of Chaimson's cash bribe payments in plain, white, letter-size envelopes, the Government's evidence of cash payments to the Cook County Assessor in the very same type of plain, white, letter-size envelopes bears that strong indicia of resemblance necessary to establish a preexisting plan. Accordingly, we hold that the Government's "other acts" evidence of previous cash bribe payments to the Chief Deputy Assessor of Cook County satisfies the four-prong test of Rule 404(b) in this circuit, and thus was properly ruled admissable to prove the element of intent and the existence of a plan.

## B. ALLEGED PROSECUTORIAL MISCONDUCT

■ Chaimson next contends that the prosecutor's alleged misconduct deprived him of a fair trial. Chaimson argues that his case was unfairly prejudiced by the prosecutor's: (1) questioning of Erskine on redirect examination as to the reason he received relocation expenses from the Government; (2) questioning of Chaimson on recross-examination about his son hiring a criminal attorney after passing a plain, white, letter-size envelope to Woodlock; and (3) reference, in closing argument, to Chaimson as a liar, to the fact that Chaimson's son did not testify, and to the implication that Chiamson lied to his defense counsel. We briefly address each of these claims under the well-settled standard of review that we are to consider the prosecutor's conduct not in isolation, but in the context of the trial as a whole, to determine if such conduct was "so inflammatory and prejudicial to the defendant ... as to deprive him of a fair trial...." *United States v. Zylstra*, 713 F.2d 1332, 1339 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct.

403, 78 L.Ed.2d 344 (1983) (quoting *United States ex rel. Clark v. Fike*, 538 F.2d 750, 760 (7th Cir.1976), *cert. denied*, 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977)). *See also United States v. Young*, —— U.S. ——, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985); *United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 448, 83 L.Ed.2d 373 (1984); *Jentges v. Milwaukee County Circuit Court*, 733 F.2d 1238, 1242 (7th Cir. 1984); *United States v. Carter*, 720 F.2d 941, 950 (7th Cir.1983). It is well understood in the realm of ethical and proper conduct of a criminal trial, that the prosecutor "may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). *See also United States v. Young*, 105 S.Ct. at 1042; *United States v. Covelli*, 738 F.2d 847, 857 (7th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984); *United States v. Reagan*, 694 F.2d 1075, 1079 (7th Cir.1982); *United States v. West*, 670 F.2d 675, 688 (7th Cir.), *cert. denied*, 457 U.S. 1124, 1139, 102 S.Ct. 2944, 2972, 73 L.Ed.2d 1340, 1359 (1982).

The record reveals that during the cross-examination of Erskine, Chaimson's defense counsel inquired about the amount of money Erskine had received from the government for expenses and witness fees between February 1981 and February 1983. Erskine replied, "In grand total somewhere in the area of $4,000." Chaimson's defense counsel then asked how much of the $4,000 had been applied to the fine that Erskine owed the United States Government as a result of his plea bargain. Erskine responded, "Nothing." The intent of the questioning by Chaimson's counsel obviously was to impeach Erskine and to create the inference that he was failing to adhere to his agreement with the Government to pay his fine. On redirect examination, the Government merely clarified the record by eliciting testimony from Erskine that only "$1,800 to $2,000" of the Government's

payments were for witness fees. Erskine testified that the "other money was reimbursement for relocation expense and one trip to Fort Lauderdale—the Fort Lauderdale area in Florida at the Government's request." Erskine further stated that the purpose of the trip to Fort Lauderdale, Florida was to "seek out two individuals and tape them." The Government then inquired as to the purpose of the relocation expenses, at which time the defense counsel raised a general objection, the trial judge overruled the objection, and Erskine stated that:

"At the time of my pleading guilty, it became known that I was wearing a recording device and a transmittal device. It was the opinion of the Federal Bureau of Investigation that I might be in some danger, and, therefore, myself and my family should relocate temporarily."

Following Erskine's answer, Chaimson's counsel moved for a mistrial on the ground that Chaimson could not "possibly receive a fair trial with the jury now suspecting that maybe he may have been the source of those threats." The district court judge denied the motion for a mistrial and *sua sponte* instructed the jury:

"Ladies and gentlemen, I want to instruct you at this time that there is no evidence, nor is there any suspicion that Mr. Chaimson was in any way involved with any of the danger or threats that the FBI felt that Mr. Erskine was the subject of."

■ The evidence clearly reveals that Chaimson's counsel "opened the door" to the Government's inquiry into the relocation expenses when he attempted to highlight Erskine's failure to apply Government funds toward the fine. Indeed, as we stated in *United States v. Carter*, "[w]hen a party opens up a subject, even though it may not be strictly relevant to the case, he cannot complain on appeal if the opposing party introduces evidence on the same subject." 720 F.2d at 948 (quoting *United States v. Bolin*, 514 F.2d 554, 558 (7th Cir.1975)). *See also United States v. Cavale*, 688 F.2d 1098, 1112 (7th Cir.), *cert.*

*denied,* 459 U.S. 1018, 103 S.Ct. 380, 74 L.Ed.2d 513 (1982). In the present case, the prosecutor simply clarified on redirect examination of Erskine that a substantial portion of the funds he received from the Government were to reimburse him for his daily out-of-pocket expenses and to provide him with the necessary funds during his Government directed temporary relocation. These Government funds were not income, but reimbursement for expenses that Erskine incurred while cooperating with the Government's request to tape conversations in Fort Lauderdale, Florida and to temporarily relocate his family. In order to fully develop the factual circumstances surrounding these payments, the prosecutor properly inquired into the reasons for Erskine's receipt of the reimbursement and relocation expenses. Any implication, inference, or though that the relocation expenses were necessary as a result of alleged threats made by Chaimson was completely dispelled by the district court's *sua sponte* curative instruction to the jury. Thus, in view of the fact that the defense counsel "opened the door" on the issue of the Government funds, we hold that it was a proper trial tactic and not prejudicial error for the prosecutor to elicit testimony to explain the payments made to Erskine in full detail.

■ The record further reveals that the Government asked Chaimson, on cross-examination, if "in September 1980, your own son told you that he passed an envelope to Jim Woodlock...." Chaimson responded, "Yes." On redirect examination, the defense counsel inquired of Chaimson if, in September 1980, he had informed his son that there was "probably a list in the envelope," containing the names and file numbers of Welfeld & Chaimson cases pending before the Board. Chaimson responded, "I told him that, that is absolutely correct." The purpose of this redirect examination was to lend credence to Chaimson's theory of defense that he did not participate in making bribe payments to employees at the Cook County Board of Appeals and that he had no knowledge of

the fraudulent assessment reduction scheme at the Board. In an attempt to rebut Chaimson's testimony that he had no notice of the scheme, the Government, on recross-examination, asked Chaimson if his "son also went out in September of 1980 and hired a criminal attorney ...." Chaimson's counsel objected before Chaimson answered the question, the trial judge sustained the objection, and immediately instructed the jury "to disregard the last question." Upon examination of the entire record, we are convinced that the prosecutor's unanswered question, standing by itself, and followed not only by a sustained objection but also by a curative instruction, does not rise to the level of prejudicial error requiring a new trial. The Government established in its case-in-chief that Chaimson instructed Alexander, as well as his son, Fred Chaimson, to deliver plain, white, letter-size envelopes containing bribe payments to computer operator Woodlock. The jury was presented with sufficient evidence, irrespective of the prosecutor's question, to conclude that Chaimson had complete knowledge, and thus notice, of the scheme and of the bribe payments to Woodlock. Moreover, any possible prejudice resulting from the Government's unanswered and stricken question was cured immediately by the district court's *sua sponte* instruction to the jury to disregard the question. *See, e.g., United States v. Reagan,* 694 F.2d at 1080. Accordingly, we hold that that prosecutor's unanswered question did not deprive Chaimson of a fair trial.

Finally, we review the Government's closing argument to determine if the prosecutor's references to Chaimson as a liar, his comment that Chaimson's son did not testify, and the implication that Chaimson lied to his defense counsel, constitute prejudicial error requiring a new trial. The forty-eight page transcript of the Government's closing argument reveals the following references to Chaimson as a liar:

"Ladies and Gentlemen, this is a case about a dishonest lawyer named Sam Chaimson, ... who took the witness stand before you in this case, and, to put it plainly and simple, lied his head off.

\* \* \* \* \* \*

And, we also know that he was involved, ladies and gentlemen, because he lied. He lied to you from the witness stand when he told you that he neither participated in this scheme nor knew anything about it.

\* \* \* \* \* \*

The one person who had a motive and a big motive to lie and did lie, was Sam Chaimson."

The law in this circuit is well-settled that a prosecutor may characterize the defendant as a liar, "[b]ut where the terms 'fabricated' or 'lies' are used repeatedly to the point of excessiveness, the line between the 'undignified and intemperate' and the hard or harsh but fair may be crossed with a resultant impairment of 'the calm and detached search for the truth to which a criminal trial should aspire.'" *United States v. Craig,* 573 F.2d 455, 494 (7th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110 (1978) (citations omitted). In the present case, the Government's reference to Chaimson as a liar did not reach the point of excessiveness. In view of attorney Chaimson's absolute and unequivocal denial that he had any knowledge of the fraud scheme, the Government had little choice but to discredit Chaimson's testimony as fabricated lies. The references to Chaimson as a liar were interspersed throughout the forty-eight page transcript of the prosecutor's closing argument and, in view of Chaimson's defense at trial, were a fair characterization of the defendant. Upon review of the totality of the trial record, we hold that the Government's references to attorney Chaimson as a liar did not cross the line of excessiveness nor impair the jury's calm and detached search for the truth.

The record further reveals that during closing argument, the prosecutor stated that Fred Chaimson, the defendant's son, told his father, "I'm worried about that envelope that I gave to Woodlock in

January of '79." Chaimson's counsel objected to this statement on the ground that "Mr. Fred Chaimson didn't testify in this case...." The trial judge sustained the objection and the prosecutor responded, "Fred Chaimson didn't testify ladies and gentlemen, and if the defense wanted him to testify, they could have called him." Chaimson's counsel instantly replied, in the presence of the jury, "As could the Government, your Honor." The prosecutor acknowledged, "That is correct," and continued his closing argument. The prosecutor's comment—that the defense failed to call Fred Chaimson as a witness—when viewed in the context of the defense counsel's instant reply, did not prejudice Chaimson's case. Indeed, the Government immediately acknowledged that the prosecution, too, could have called Fred Chaimson as a witness. Chaimson argues that the prosecutor's comment concerning his son's failure to testify was intended to have the jury draw an inference of guilt from the absence of a witness. This argument finds no support in the record as the prosecutor immediately admitted that the Government, as well, could have called Fred Chaimson as a witness. Following this admission by the Government, the jury fully realized that either party could have elicited testimony from Fred Chaimson.[9] Accordingly, we hold that the prosecutor's comment, when viewed in the context of the trial as a whole, did not deprive Chaimson of a fair trial.[10]

■ The prosecutor also commented, during closing argument, that:

"Alexander told Chaimson that he had this lawyer that he hired as a result of his subpoena.

And what did Chaimson say to Alexander? You heard Mr. Alexander testify. He said, 'don't tell your lawyer the truth.'

Now, ladies and gentlemen, if Mr. Chaimson could tell his law partner to lie to his attorney, how can you believe him when he takes the stand here? What do you think he told his own attorneys?"

Chaimson argues that these remarks create the inference that he not only lied to his own attorneys but that the defense counsel took part in the lies. Chaimson's novel claim lacks merit. The record reveals that Chaimson testified in his own defense, and thus placed his credibility in issue. In addition, Chaimson called six character witnesses to testify as to his reputation for truth and veracity. The prosecutor's comments concerning Chaimson's advice to Alexander, to lie to his attorney, simply attacked the defendant's character and his ability to tell the truth. The prosecutor struck hard but fair blows that were reasonable, especially in view of the fact that Chaimson, as an attorney, was well-trained in the nuanc-

---

9. We note, however, that Fred Chaimson is the defendant's son and "when the witness has a relationship with the opposing party 'that would in a pragmatic sense make his testimony unavailable to the opposing party regardless of physical availability' " that witness is "peculiarly within the other party's power to produce." *United States v. Mahone,* 537 F.2d 922, 926 (7th Cir.1976), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976) (quoting *Yumich v. Cotter,* 452 F.2d 59, 64 (7th Cir.1971), *cert. denied,* 410 U.S. 908, 93 S.Ct. 955, 35 L.Ed.2d 269 (1973)). *See also United States v. Williams,* 739 F.2d 297, 299 (7th Cir.1984). Thus, in view of Fred Chaimson's father-son relationship with the defendant, it would have been, at best, difficult for the Government to call Fred Chaimson as a witness.

10. Chaimson also complains that the prosecutor's reference to the fact that Fred Chaimson received governmental immunity constitutes

prejudicial error. We disagree. The prosecutor simply stated:

"Then Fred, in June of 1982, you heard the testimony, got immunized and cooperated against Peter Alexander. What was Fred getting immunized for, ladies and gentlemen? Wouldn't that have sparked some concern in Sam Chaimson's mind?"

Fred Chaimson received governmental immunity because he knew of Welfeld & Chaimson's involvement in the fraudulent assessment reduction scheme at the Cook County Board of Appeals and was willing to testify concerning Peter Alexander's participation in the scheme. Fred Chaimson's knowledge of this fraudulent scheme was certainly relevant to rebut the defendant's absolute and unequivocal denial that he, as the managing partner at Welfeld & Chaimson and Peter Alexander's supervisor, had no knowledge of the very same fraudulent assessment reduction scheme.

es of presenting evidence in the best light to a jury, but continued to deny any participation in the fraudulent assessment reduction scheme despite overwhelming evidence to the contrary. Thus, upon review of the entire record, we hold that the Government's remarks, comments, and conduct did not rise to the level of denying attorney Chaimson his constitutional right to a fair trial.

### III

We affirm the defendant's conviction for fifteen counts of mail fraud in violation of 18 U.S.C. § 1341 and one count of racketeering in violation of 18 U.S.C. § 1962(c).

CUDAHY, Circuit Judge, concurring:

I agree that the law in this circuit seems to allow the government to introduce other-crimes evidence, in its case-in-chief, merely if the crime in question is one requiring specific intent. I have some doubts about the defensibility of that rule; it would seem to me more appropriate to follow the general rule that, as evidence of intent, other crimes are never admissible unless intent has been disputed or called into question. But this is not my reason for writing separately. Rather, I have two reservations about the way the rule has been implemented in this case.

In the first place, the rule should not be so understood as to make the admissibility of other-crimes evidence automatic where the crime is one of specific intent. Even if we adopt the fiction that intent is always in question in such cases, such evidence is only admissible if it is really introduced to show *intent*. The government must show the relevance of the evidence to the question of intent. It cannot simply flood the courtroom with other-crimes evidence on the grounds that the crime was one of specific intent.

The second point is that our rule governs the evidence admissible in the case-in-chief. The admission of the evidence here is justified as being in rebuttal. But the majority says that there was sufficient evidence to prove intent initially, and the defendant did not dispute the intent evidence; he maintained that he did not commit the crimes. Unless the government set about to introduce new evidence on each element of the crime after his denial, there is abundant reason to be cautious here. For evidence of other crimes proves that the defendant is a criminal, and for that reason it cannot be used unless there is preponderant need to use it to prove some other, legitimate point. I would argue, therefore, that where the government has not been able to get the evidence in during its case-in-chief, it should not be allowed to do so in rebuttal, unless in actual rebuttal of some particular point made by the defendant.

Here, I agree that the evidence in question would have been admissible, in any event, under several other categories of exception to the other-crimes rule—as the majority argues—and therefore I do not think the trial judge abused his discretion.